OPINION OF THE COURT
Robert J. Stolarik, J.
This is an action to impress a trust upon the assets of an estate. The plaintiff contends that during a six-week period preceding the death of her aunt, there was active interference on the part of the defendant (the decedent’s granddaughter), and the decedent’s attorney, which frustrated decedent’s desire to change her will in favor of the plaintiff. This claim is resisted by defendant who asserts her status as the lawful heir and denies any wrongdoing.
On November 1, 1984, Victoria Paul died at the age of 91. The plaintiff, Rhea Dawson, her niece, shared a close relationship with her aunt over the years, visiting her often, and during her later years, staying with her for extended periods, looking to her aunt’s needs and tending to the household chores. The defendant, Cheryl Vasquez, is the decedent’s granddaughter. She visited with her grandmother from time to time, but apparently did not enjoy as close a relationship with her as did the plaintiff Rhea Dawson.
After her husband died, Victoria Paul made a will, in 1980, *589 leaving her entire estate to Rhea Dawson. In 1982, she changed her will, leaving everything to her granddaughter, Cheryl Vasquez (with a small bequest to her grandson). On September 19, 1984, Victoria Paul broke her hip and was hospitalized. Rhea Dawson was contacted at her home in Canada, and, although she had just returned from a visit to her aunt, she arranged to come back to New York, arriving on September 21, 1984. At first she found her aunt in a delirious state (as a result of overmedication) but this condition passed, and, although in a weakened condition, she gradually resumed her feisty, imperious ways. Rhea Dawson stayed at her aunt’s home in Stony Point after she came to New York, but left the premises after a few days at the insistence of her aunt’s attorney, who had been contacted by defendant. It is clear from the record that defendant did not want the plaintiff in Mrs. Paul’s house, although she had stayed there many times before and had a key which had been entrusted to her by her aunt. It is equally clear that defendant felt threatened by plaintiffs presence, knew that her grandmother wanted to change her will, was concerned that her grandmother might change her will, and, in addition to seeking the attorney’s assistance, sought the help of the local police and the District Attorney in having Rhea Dawson removed from the premises. At the attorney’s suggestion, she left the premises, but returned when her aunt was released from the hospital, caring for her until her demise.
Between the day of her accident and her death, Victoria Paul made many requests of her attorney to draw up a new will, making her niece, Rhea Dawson, her sole beneficiary. She made this request from the hospital and from her home, and her attorney acknowledged that he had spoken to her several times on the subject, the last occasion being at her home a few days before she died. In spite of her repeated entreaties for him to change her will, he declined to do so, and the 1982 will, leaving the bulk of her estate to the defendant, was probated a few weeks after her death in November 1984.
During this period of time, defendant was in frequent contact with her grandmother’s attorney, both at his home and at his office. Although she denied same, the record is clear that she wanted Rhea Dawson out of her grandmother’s house and prevailed upon the attorney to assist her in this regard; that she spoke to the attorney about the will and of her desire that it not be changed, and that she threatened a will contest if her grandmother executed a new will in favor of the *590 plaintiff. The record is equally clear that the attorney allowed himself to be influenced by the defendant (even to the extent of assuring her, by letter, that the will "is staying just as it is until Mrs. Paul is much, much better”) and that his first obligation, which was to his client, became obscured by the antics of the defendant, and possibly by his own desire to handle the estate. The attorney testified that he was concerned about Mrs. Paul’s "competency”, and wanted a doctor to witness the will, but even after he was advised by her physician that her "mind was clear”, he neglected to draw a new will and attempt to secure a physician to witness it. He also stated that he was less concerned about "undue influence”, and saw no evidence of it by Rhea Dawson, and that he was also somewhat persuaded in his attitude by the defendant’s threat to contest the will. The attorney testified also that he had advised decedent to obtain another lawyer if she wanted a new will drawn, but it is not clear when he did this or how emphatic he was about it. The fact remains that he kept talking to her, neglected to carry out her wishes, and apparently had decided that there would be no new will until the decedent was "much, much better”. It is clear that the deceased wanted to change her will making the plaintiff her sole beneficiary. There is also no evidence to show that Mrs. Paul was not competent to make this decision or that the plaintiff exercised any undue influence over her aunt.
Accordingly, the court finds that it has been shown, by a fair preponderance of the credible evidence, that but for the influence of the defendant, and the resultant indecision and misplaced loyalty of her (Mrs. Paul’s) attorney, the decedent would have changed her will prior to her demise. Or, put another way, the combined actions of the defendant and the attorney were a proximate cause of the decedent’s wishes being frustrated and the plaintiff’s being deprived of her inheritance. Plaintiff argues that in these circumstances equity demands that a constructive trust be created and that the legatee or devisee who prevented the testator from making a new will in favor of another holds the property in trust for the intended legatee or devisee. (Latham v Father Divine, 299 NY 22.) The court agrees. Indeed, the concept of this landmark case envisions equitable relief in situations "whenever necessary to satisfy the demand of justice. Since a constructive trust is merely the formula through which the conscience of equity finds expression’ (Beatty v. Guggenheim Exploration Co., 225 N. Y. 380, 386 * * *), its applicability is limited only by *591 the inventiveness of men who find new ways to enrich themselves unjustly by grasping what should not belong to them. Nothing short of true and complete justice satisfies equity, and, always assuming these allegations to be true, there seems no way of achieving total justice except by the procedure cited here.” (Latham v Father Divine, supra, at 27.) When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee (Beatty v Guggenheim Exploration Co., supra), and "The court does not restrict itself by describing all the specific forms of inequitable holding which will move it to grant relief, but rather reserves freedom to apply this remedy to whatever knavery human ingenuity can invent” (Bogert, Trusts & Trustees § 471, at 29 [2d ed rev 1978]).
Sharp v Kosmalski (40 NY2d 119) enumerates four factors that are generally cited as being basic to the imposition of a constructive trust (a fiduciary relationship, a promise, a transfer in reliance upon the promise, and unjust enrichment). But, though these factors are useful in many cases, constructive trust doctrine is not rigidly limited (Simonds v Simonds, 45 NY 233, 241). The instant case is similar in many respects to the circumstances in Latham v Father Divine (supra), where, in the absence of a fiduciary relationship, a promise and a transfer in reliance upon the promise, a constructive trust was imposed, the court finding that the testator was wrongfully prevented by the beneficiary from executing a will eliminating him as a beneficiary.
The purpose of the constructive trust is to prevent unjust enrichment. (Sharp v Kosmalski, 40 NY2d 119, supra; Restatement of Restitution § 160; 5 Scott, Trusts § 462.2 [3d ed].) What is required, generally, is that a party hold property "under such circumstances that in equity and good conscience he ought not to retain it” (Miller v Schloss, 218 NY 400, 407; Sharp v Kosmalski, supra; Sinclair v Purdy, 235 NY 245).
On the record herein, the court finds that the unjust enrichment is obvious. Victoria Paul wanted to change her will naming plaintiff as her sole beneficiary. The defendant, knowing this, and employing the assistance of the decedent’s attorney, successfully conspired to prevent the execution of a new will. Had the decedent changed her will, plaintiff would have been her sole beneficiary under the new will, as was the wish of the decedent. Accordingly, the court finds that the beneficiaries of the 1982 will have been unjustly enriched, and the *592 entire content of the estate of Victoria Paul should be subjected to a constructive trust. The court would also emphasize that this imposition includes the bequest to the grandson. Unjust enrichment does not require the performance of a wrongful act by the one enriched. (Simonds v Simonds, supra; Lengel v Lengel, 86 Misc 2d 460.)
The court takes cognizance of the general principle of equity that "equity regards as done that which should have been done” (2 Pomeroy, Equity Jurisprudence § 364 [5th ed]). Mrs. Paul’s will should have been changed. The court now finds that equity demands that this be "done” by the imposition of a constructive trust. "The equity of the transaction must shape the measure of relief’ (Beatty v Guggenheim Exploration Co., supra, at 389 [Cardozo, J.]).