WEIZMANN INSTITUTE OF SCIENCE, Plaintiff,

v.

Janet C. NESCHIS, individually and in her capacities as Trustee of the Jacques and Natasha Gelman Trust dated November 18, 1997, and as Trustee of the Trust Created Under the Last Will and Testament of Natasha Gelman dated April 23, 1993, Robert R. Littman, individually and in his capacity as Successor Trustee of the Trust Created Under the Last Will and Testament of Natasha Gelman dated April 23, 1993, and Marilyn G. Diamond, in her capacity as Trustee of the Jacques and Natasha Gelman Trust dated November 18, 1997, and as Trustee of the Trust Created Under the Last Will and Testament of Natasha Gelman dated April 23, 1993, Defendants.

Alice Ann Jung on her own behalf, as Executrix of the Estate of Miroslav Jung, Deceased, et al., Plaintiffs,

v.

Janet C. Neschis, et al., Defendants.

Nos. 00 Civ. 7850(RMB), 01 Civ. 6993(RMB).

United States District Court, S.D. New York.

Dec. 14, 2005.

656

Elise A. Yablonski, Leon P. Gold, Proskauer Rose LLP, New York, NY, John E. Horan, Fox, Horan & Camerini LLP, New York, NY, for Weizmann Institute of Science.

Andrew Keith Solow, Edward Clinton Crouter, Jane W. ·Parver, Paul Jerome Curran, Kaye Scholer, LLP (NYC), New York, NY, for Janet C. Neschis, Janet C. Neschis, as Trustee.

John B. Koegel, Koegel & Rosenthal, L.L.P., New York, NY, for Robert R. Littman, Robert R. Littman, as Trustee.

### DECISION AND ORDER

BERMAN, District Judge.

## I. Introduction

■ On October 16, 2000, plaintiff Weizmann Institute of Science ("Weizmann") filed a complaint against Janet Neschis ("Neschis"), Robert Littman ("Littman") and Hon. Marylin Diamond ("Diamond") (collectively, "Defendants") alleging that Defendants had engaged in a scheme fraudulently or illegally to obtain the assets of the estate of elderly Natasha Gelman ("Mrs.Gelman"), including the assets of Anturia Foundation ("Anturia" or "Foundation"), a Liechtenstein "stiftung" (or foundation) created by Mrs. Gelman and her late husband Jacques.[1] On July 30, 2001, Alice Ann Jung ("on her own behalf, as Executrix of the Estate of Miroslav Jung"), Josef Jung, Michelle Jung, and Jaroslav Jung, a/k/a Jerry Jung (collectively, the "Jungs"), who are relatives of Mrs. Gelman, filed a separate complaint containing similar allegations as those made by Weizmann against Defendants. (*See* Jung Amended Complaint, dated October 30, 2002, ¶ 1 (Defendants conspired to defraud Mrs. Gelman, "an elderly widow who became mentally incompetent in the last years of her life," in order to "obtain control over Mrs. Gelman's substantial assets and divert them to [Defendants'] personal use and benefit.").) On September 26, 2001, the Court consolidated the *Weizmann* and *Jung* actions for pre-trial purposes, including motion practice.[2]

On October 19, 2001, Defendants moved jointly, pursuant to Federal Rules of Civil Procedure ("Fed. R. Civ.P.") 12(b)(6) and 12(b)(7), to dismiss Plaintiffs' claims, alleging, among other things, that Plaintiffs' claims were collaterally estopped by the final 53–page arbitration award, dated

---

1. "A stiftung is a creation of the laws of Liechtenstein . . ., resembling a trust, but not limited to specific lives in being. A stiftung can own property and is controlled by an administrator (known as a stiftungerat) whose powers and duties are comparable to a trustee." *Kraus v. Comm'r*, 59 T.C. 681, 685, 1973 WL 2582 (U.S.Tax Court, 1973).

Weizmann is a charitable organization located in Rehovet, Israel whose scientists and graduate student members perform research and development in the areas of disease and hunger, environmental protection, and economic growth. (Weizmann Compl. ¶ 6.)

2. Weizmann and the Jungs are referred to collectively as "Plaintiffs."

June 8, 2001 ("Award"), issued following arbitration proceedings conducted on or about September 13, 2000 and November 30, 2000 in Liechtenstein ("Liechtenstein Arbitration") between and among Anturia, Neschis, Diamond, Weizmann, and all of the Jungs except Jerry Jung. The arbitration tribunal ("Tribunal") determined, *inter alia,* that by-laws adopted by the Anturia board of directors ("Anturia Board") on or about October 19, 1992 ("1992 By-laws") and on or about January 27, 1998 ("1998 By-laws") "are legally valid" because "at the time [Mrs. Gelman] signed her instructions" directing the adoption of those By-laws, she "possessed testamentary capacity" and was not "unduly influenced by a third party." (Affidavit of Edward C. Crouter, dated Dec. 20, 2004 ("Crouter Aff."), Ex. 42: Award at 34–35; *accord id.* at 39; *see id.* at 17–18 ("all the circumstances ... clearly indicate that [Mrs. Gelman's 1992 instructions to the Anturia Board] reflect her true wishes and intentions")). Defendants also moved to dismiss on the grounds that Plaintiffs were collaterally estopped by a probate decree, dated October 16, 2001 ("Probate Decree"), entered in Surrogate's Court, New York County ("Probate Proceedings"), which admitted to probate Mrs. Gelman will, dated April 23, 1993 ("1993 Will"), over the objections of Alice Jung and Jerry Jung. The Probate Decree had concluded that: (1) "the [1993] Will was duly executed;" (2) "the Testatrix, at the time of executing it, was in all respects competent to make a Will, and not under restraint;" and (3) "the Court [is] satisfied of the genuineness of the [1993] Will and the validity of its execution." (Probate Decree at 2.)

On October 3, 2002, the Court granted in part and denied in part Defendants' motion to dismiss on collateral estoppel grounds, holding, among other things, that (1) "[a]t this stage of the litigation (*i.e.*

absent further discovery) it is inappropriate for the Court to make a determination of whether or not Plaintiffs had a full and fair opportunity to participate in the Liechtenstein Arbitration"; and (2) "the admission of the 1993 Will to probate precludes the Jungs from re-litigating the validity of the 1993 Will, including Mrs. Gelman's testamentary capacity to execute the will." *Weizmann Institute of Science v. Neschis,* 229 F.Supp.2d 234, 248–49 (S.D.N.Y.2002) ("Dismissal Order"). The Court also, among other things: (1) held that "[i]f Plaintiffs wish to pursue declaratory relief claims as presently plead, joinder of Anturia is warranted," and "[i]f joinder is not feasible, then Plaintiffs must show why the declaratory judgment claims should not be dismissed," *id.* at 251; (2) "reache[d] no conclusion as to compliance with the applicable limitations periods at this time" regarding Plaintiffs' claims of conversion and tortious interference with contract, *id.* at 252; (3) held that, applying New York law, "Plaintiffs have adequately plead a conversion claim premised upon their future interest in the Foundation's funds pursuant to the August 10, 1989 By–Laws and/or the August 13, 1991 By–Laws," *id.* at 253; (4) denied Defendants' motion to dismiss Plaintiffs' claim of tortious interference with contract because "the Court is not in a position, at this time, to resolve the issue of whether or not a [valid, enforceable] contract existed" between the Gelmans and Anturia under Liechtenstein law, *id.* at 253–54; *see id.* at 253 n. 26 ("the Court does not here determine whether the Anturia by-laws formed a 'valid enforceable contract' as alleged in the Complaints"); (5) dismissed Plaintiffs' claim of tortious interference with prospective inheritance because " 'New York ... has not recognized' " such a claim, *id.* at 254 (citation omitted); (6) dismissed Plaintiffs' RICO claims against Littman and

Neschis because "Plaintiffs have failed to plead two predicate acts of racketeering activity by Littman" and "fail[ed] to plead that Neschis' alleged predicate acts constitute either a closed-ended or an open-ended pattern," *id.* at 254–57 ("[N]one of the ... indicia of closed-ended continuity—*i.e.*, a large number and variety of predicate acts, a large number of either participants or victims, and the presence of separate schemes—is present in this case. The Complaints plead four predicate acts of mail fraud, committed by one participant (Neschis) against a limited number of victims (Weizmann and the Jungs) in furtherance of a single fraudulent scheme (to gain control of Mrs. Gelman's assets)."); (7) dismissed the Jungs' constructive trust claim because "the Jungs have failed to allege either a promise or a transfer of any property in reliance on a promise," *id.* at 257–58; and (8) denied the Jungs' claim for injunctive relief because "[t]here is absolutely no basis in law for an injunction to issue to remedy [their] alleged monetary damages," *id.* at 258–59.

On October 30, 2002, the Jungs filed an amended complaint ("Jung Compl.") seeking a declaratory judgment against all Defendants that the Jungs are entitled to 27% of Anturia's assets, and asserting claims for: (1) conversion against Neschis and Littman; (2) tortious interference with contractual relations against Neschis and Littman; (3) violations of the Racketeering Influenced and Corrupt Organiza-

tion Act of 1970 ("RICO"), 18 U.S.C. § 1962(c) and (d), against Neschis and Littman; and (4) unjust enrichment against all Defendants; and (5) constructive trust against all Defendants.[3] Jung sued each of the Defendants both individually and in their capacities as trustees of the "Jacques and Natasha Gelman Trust," dated November 18, 1997 ("Inter Vivos Trust"), and/or of the trust created under the Last Will and Testament of Natasha Gelman, dated April 23, 1993 ("Testamentary Trust").[4] (Jung Compl. ¶¶ 26, 28, 29.)

On October 30, 2002, Weizmann filed an amended complaint ("Weizmann Compl.," together with the Jung Complaint, the "Complaints") asserting claims for: (1) conversion against Neschis and Littman; (2) tortious interference with contractual relations against Neschis and Littman; (3) RICO violations, 18 U.S.C. § 1962(c) and (d), against Neschis and Littman; and (4) constructive trust against all Defendants.[5] Weizmann sued: (1) Neschis both individually and in his capacities as trustee of the two trusts; (2) Littman both individually and in his capacity as trustee of the Testamentary Trust; and (3) Diamond "solely in her capacities as Trustee" of the two trusts. (Weizmann Compl. ¶¶ 7–9 ("No allegations of unlawful conduct herein are directed against Diamond.").)

On December 20, 2004, Defendants jointly moved for summary judgment pursuant to Fed.R.Civ.P. 56(c), arguing that

---

3. The Jung Complaint also included claims against Anturia and the members of Anturia's Board, Dr. Martin Escher ("Escher"), Dr. Conrad Schulthess, and Dr. Peter Sprenger. These claims were dismissed with prejudice on April 7, 2003. *See Jung v. Neschis*, 01 Civ. 6993, 2003 WL 1807202, at *3 (S.D.N.Y. Apr.7, 2003) ("Plaintiffs have failed properly to serve the Defendants in Liechtenstein").

4. Littman was (successor) trustee of the Testamentary Trust, not the Inter Vivos Trust.

5. "[S]olely for purposes of preserving plaintiff's right to appeal," the Weizmann Complaint also replead two claims that the Court had dismissed in the Dismissal Order (*i.e.*, Count VI, seeking a declaratory judgment against all Defendants that Weizmann is entitled to 20% of Anturia's assets, and Count VII, asserting a claim for tortious interference with expectancy of inheritance against Neschis and Littman). (Weizmann Compl. ¶¶ 169–79 & nn. 1–2.)

"[b]ecause the issues Plaintiffs seek to litigate here are identical to those actually litigated, decided, and necessary to the [Liechtenstein Arbitration] Award, and because the evidence demonstrates that Plaintiffs had a full and fair opportunity to litigate such issues in the Arbitration, collateral estoppel ... warrants dismissal of the Amended Complaints with prejudice." (Defendants' Memorandum of Law, dated Dec. 20, 2004 ("Def.Mem."), at 1.) Defendants also moved, alternatively, under Fed.R.Civ.P. 12(b) to dismiss: (1) "the Jungs' claim for declaratory judgment ... because Anturia is an 'indispensable' party under Fed.R.Civ.P. 19(b)" (Def. Mem. at 12–13); (2) Plaintiffs' conversion claims with respect to the 1992 By-laws because "Liechtenstein law does not recognize a claim for conversion" and "New York does not recognize a claim for conversion that is premised on a potential beneficiary's 'contingent interest' " (*id.* at 13–15); (3) Plaintiffs' claims for tortious interference with contractual relations because, among other things, "Liechtenstein law would not recognize a valid contract between the Gelmans and Anturia" (*id.* at 15–16); (4) the Jungs' claims for conversion and tortious interference because they are time-barred under New York's three-year limitations period (*id.* at 16–17); (5) Plaintiffs' RICO claims because, among other things, "Plaintiffs still allege a discrete, limited scheme by two participants (Neschis and Littman) against two victims (Weizmann and the Jungs) in furtherance of a single fraudulent goal (to gain control of Mrs. Gelman's assets)" (*id.* at 18–22); (6) the Jungs' unjust enrichment claim because it would "not be recognized under Liechtenstein law" and because the Jungs failed to prove under New York law that "they performed services for Defendants or that Defendants benefitted from such services" and that the Jungs and Defendants shared a "contractual or quasi-contractual rela-

tionship" (id. at 17–18); and (7) Plaintiffs' constructive trust claims because Liechtenstein law "would not recognize" such claims, and because under New York law "Plaintiffs do not allege the existence of a promise or a transfer made in reliance on that promise" and "Plaintiffs have not alleged facts demonstrating that a legal remedy ... is inadequate here" (*id.* at 22–25).

Plaintiffs opposed summary judgment, arguing that "the Liechtenstein arbitration decision is not entitled to recognition in the United States for any purpose, including collateral estoppel" because: (1) Liechtenstein is not a signatory to the Convention on Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 ("Convention"), and (2) the Arbitration "failed to meet minimum standards of fundamental fairness." (Plaintiffs' Joint Memorandum in Opposition to Summary Judgment Or In The Alternative to Dismiss, dated Feb. 22, 2005 ("Pl.Mem."), at 1, 5.) Plaintiffs also opposed Defendants' motion to dismiss. (Pl. Mem. at 17–25.) Defendants filed a Reply Memorandum of Law, dated March 18, 2005 ("Def.Reply"), and the parties declined oral argument.

**For the reasons set forth below, the Court grants in part and denies in part Defendants' motion for summary judgment, and grants in part and denies in part Defendants' motion in the alternative to dismiss.**

## II. Background

Jacques and Natasha Gelman, a married couple with no children, amassed a large fortune, principally as a result of Mr. Gelman's successful career as an entertainment agent and film producer. In 1985, the Gelmans contributed a substantial portion of their assets to Anturia, a Liechtenstein "stiftung" or foundation, which was governed by a Charter, dated May 9, 1985

("Charter," Crouter Ex. 1).[6] (*See* Defendants' Rule 56.1 Statement ("Def.56.1") ¶ 1; Jungs' Rule 56.1 Statement ("Jung 56.1") ¶ 1; Weizmann's Rule 56.1 Statement ("Weizmann 56.1") ¶ 1.) KPMG Fides ("Fides") administered Anturia, and Anturia's funds were invested with Credit Suisse Trust ("Credit Suisse"). (Def. 56.1 ¶¶ 2–3.) Based upon instructions from the Gelmans, the Anturia Board enacted by-laws from time to time, which provided for the distribution of Anturia's assets upon the death of the Gelmans.

The Charter contains a mandatory arbitration clause, stating, in relevant part as follows:

> Any disputes that may arise during the existence of the Foundation or upon its liquidation and that involve matters pertaining to the Foundation, the Board of Trustees, or the beneficiaries of the Foundation, shall be resolved exclusively by an arbitral tribunal. The arbitral tribunal shall consist of two arbitrators and a third arbitrator [or referee]. **The arbitral tribunal's decision shall be final, any recourse to courts of law being thereby excluded.**
>
> The arbitration tribunal shall be appointed as follows: Each party shall select one arbitrator, and these arbitrators shall then appoint a third arbitrator.

(Charter Article 13 (emphasis added).) The By-laws contain a so-called *"in terrorem"* clause, as follows:

> No one of the beneficiaries has an enforceable claim against the Foundation. If a beneficiary judicially attacks the Foundation or any clauses of the Articles [Charter] or the By–Laws, said beneficiary immediately loses its or his or her interest as beneficiary of the Foundation in favour of the then remaining beneficiaries of the Foundation.

(Crouter Ex. 3: 1992 By-laws, ¶ 4.)

After Mr. Gelman's death on July 23, 1986, Mrs. Gelman instructed the Board to make several (sets of) changes to Anturia's by-laws. That is, pursuant to her instructions, the Board adopted by-laws, dated August 10, 1989 ("1989 By-laws"), which provided that, in the event of Mrs. Gelman's death, Anturia's assets would be divided as follows: (1) 20% to Weizmann; (2) 34% (collectively) to the Jungs; and (3) 46% (collectively) to other named charities and beneficiaries. (Crouter Ex. 3.) And, pursuant to Mrs. Gelman's instructions, the Board adopted by-laws, dated August 13, 1991 ("1991 By-laws"), which modified the asset distributions as follows: (1) 20% to Weizmann; (2) 37% (collectively) to the Jungs; (3) 1% to Littman; and (4) 42% (collectively) to other named charities and beneficiaries. (Crouter Ex. 3.) Of principal significance here, on or about October 19, 1992, new by-laws were adopted which changed the asset distributions (to the disadvantage of Plaintiffs) as follows: (1) reducing the Jungs' allocation from 37% to 5% of Anturia's assets, (2) increasing Littman's share from 1% to 31% of the assets, (3) adding Diamond as a 3% beneficiary, (4) replacing all charitable bequests (including bequests to Weizmann) with a (single) gift of 57% of Anturia's assets to the Testamentary Trust established under Mrs. Gelman's "New York Last Will and Testament dated April 6, 1990, or any later Last Will and Testament …," and (5) awarding a total of 4% to five other non-

---

**6.** Anturia is alleged to have held more than $36 million in assets as of June 1998. (Weizmann Compl. ¶ 12.)

charitable beneficiaries. (Crouter Ex. 3; Def. 56.1 ¶¶ 7–8.)

Plaintiffs claim that the 1989 By-laws and/or the 1991 By-laws "were the last by-laws executed in accordance with Mrs. Gelman's instructions while Mrs. Gelman remained of sound mind and free of duress and undue influence," and that "some time in late 1991, Mrs. Gelman began to suffer from Alzheimer's disease." (Weizmann Compl. ¶ 20–21; Jung Compl. ¶ 55–56.)[7] Plaintiffs argue that, thereafter, and at a time when Mrs. Gelman was no longer of sound mind, her attorney (Neschis) and her art advisor (Littman) conspired to take advantage of Mrs. Gelman by "fraudulently obtaining" the 1992 By-laws (Crouter Ex. 3).[8]

In the Spring of 1992, Mrs. Gelman traveled to Zurich, accompanied by Neschis and Littman, to meet with representatives of Credit Suisse and/or Fides, the asset management company responsible for administering Anturia. (Crouter Ex. 2; Affidavit of Dr. Madeline–Claire Levis, dated April 12, 1999 ("Levis Aff."), ¶ 7.) According to Dr. Madeline–Claire Levis ("Levis"), a Fides employee who had assisted in creating Anturia and was "the person at Fides principally responsible for dealing with Anturia and the Gelmans" (Def. 56.1 ¶ 2), Mrs. Gelman "hardly spoke" at the Spring 1992 meeting with representatives of Credit Suisse and/or Fides, but "stared into space with a vacant look." Levis concluded that Mrs. Gelman "was no longer

mentally competent." (Levis Aff. ¶ 8.) Later in 1992 (on June 5, 1992, see Affidavit of Jerry Jung, dated Feb. 17, 2005 ("Jerry Jung Aff."), Ex. G), Neschis presented Levis with "typed instructions, which [Neschis] said had been signed by Mrs. Gelman, to change the beneficiary provisions of the Anturia Foundation bylaws" to eliminate Weizmann as a beneficiary and reduce the Jungs' share. (Id. ¶ 10.) Levis asserts that after she informed Neschis and Escher (one of Anturia's Board members) that she "could not accept the written instructions without some explanation as to why the changes were being requested," Neschis "grew very angry" and "threatened to withdraw the Anturia Foundation's funds from Credit Suisse Bank if the changes were not made immediately." (Id. ¶ 12.) Levis also received supplemental written instructions, dated September 29, 1992, and signed by Mrs. Gelman, directing that the By-laws be modified. (Award at 15.) Based upon Mrs. Gelman's written instructions, dated June 5, 1992 and September 29, 1992, the Board adopted, on or about October 19, 1992, the 1992 By-laws.

Mrs. Gelman's non-Anturia assets were bequeathed by her 1993 Will which was probated in Surrogate's Court in New York. Prior to executing the 1993 Will, Mrs. Gelman had executed five earlier wills between February 8, 1988 and April 6, 1990. (Crouter Ex. 5.) The earlier wills,

7. The Jungs claim 27% of Anturia's assets (Jung Compl. at 62) rather than the 37% under the 1991 By-laws because Elizabeth Jung, who was allotted a 10% share in the 1991 By-laws, predeceased Mrs. Gelman, and the 1991 By-laws provide that "[s]hould one of the beneficiaries mentioned under this clause ... predecease the first beneficiary [Mrs. Gelman,] his/her part shall go to the [charitable] beneficiaries...." (1991 By-laws at 2.) Accordingly, if, as Plaintiffs assert, the 1991 By-laws governed the distribution of An-

turia's assets, Elizabeth Jung's 10% share would devolve to Anturia's charitable beneficiaries.

8. Mrs. Gelman was represented by Diamond, a partner in the law firm of Leavy, Rosensweig & Hyman, until 1990, when Diamond left the firm to become a Civil Court judge of the City of New York, at which time Neschis (also a partner at the firm) became Mrs. Gelman's attorney. (Def. 56.1 ¶¶ 9–10.)

executed at a time (even according to Plaintiffs) that Mrs. Gelman was competent and not subject to duress or undue influence, appear to acknowledge Defendants' involvement in Mrs. Gelman's affairs. In the October 7, 1988 will, for example, Diamond and Neschis were named co-trustees and Littman was named successor trustee of a Testamentary Trust established to receive Mrs. Gelman's residuary estate. (Crouter Ex. 5; Def. 56.1 ¶ 11.) Diamond and Neschis were named "successor executors" in the February 8, 1988 and October 7, 1988 wills, and "executor" and "successor executor," respectively, in the April 26, 1989, May 10, 1989, and April 6, 1990 wills. In the 1993 Will, Neschis was named executor and Diamond was named successor executor. (Crouter Ex. 5.) Between April 26, 1989 and April 6, 1990, when, according to Plaintiffs Mrs. Gelman was competent and not subject to undue influence, the total bequests to the Jungs were substantially reduced from $2 million to $20,000. (The Jungs' bequests remained at $20,000 through the 1993 Will.) (Crouter Ex. 5.) By contrast, Littman's $500,000 bequest remained constant from February 8, 1988 through the 1993 Will. (*Id.*)

On or about November 18, 1997, Mrs. Gelman (purportedly) executed the Inter Vivos Trust, which (like the Testamentary Trust) designated Neschis and Diamond as co-trustees ("Trustees"). (Crouter Ex. 6.) Plaintiffs challenge the validity of the Inter Vivos Trust instrument because, among other things, (i) "Mrs. Gelman's signature is not verified by the notary public," and (ii) "Mrs. Gelman's execution of the instrument was purportedly witnessed by ... Neschis and a witness whose signature is utterly illegible" and "not verified." (Jung Compl. ¶¶ 155–56.) [9]

Based upon a letter to the Foundation apparently signed by Mrs. Gelman, the Board amended Anturia's by-laws (for the last time) on January 27, 1998 (the 1998 By-laws), to substitute the Inter Vivos Trust for the Testamentary Trust as the beneficiary of 57% of Anturia's assets. (Crouter Ex. 3; Def. 56.1 ¶ 13.) The 1998 By-laws modified only Anturia's charitable bequests, and did not affect or govern the non-charitable bequests to the Jungs, Littman, Diamond, *et al.*, described in the 1992 By-laws. Thus, at the time of Mrs. Gelman's death on May 2, 1998, the non-charitable Anturia bequests purportedly were governed by the 1992 By-laws and the charitable bequests were governed by the 1998 By-laws. (Def. 56.1 ¶¶ 15, 309.)

**Probate Proceedings**

Following Mrs. Gelman's death, Neschis, as executrix, offered the 1993 Will for probate in Surrogate's Court, New York County. On May 4, 1999, Alice Jung and Jerry Jung filed Amended Objections to Probate and Jury Demand stating, among other things, that the 1993 Will "was not freely or voluntarily made by [Mrs.] Gelman ... but that the said paper writing purporting to be her Last Will and Testament ... was procured by duress and undue influence ... [by] Janet Neschis and Robert Littman...." *See Weizmann,* 229 F.Supp.2d at 245 (quoting Amended Objections to Probate and Jury Demand, dated May 4, 1999, ¶ 4). (*See also* Ex. 93: Verified Petition, dated Feb. 8, 2000, ¶ 5.) **Of interest here, by stipulation, dated April 24, 2001, the Jungs agreed to withdraw their objections to probate of the 1993 Will if the Liechtenstein Arbitration "determine[d], for any reason, that**

---

9. The notary attested that "Neschis stated to him that. Neschis saw Mrs. Gelman execute the instrument." (Jung Compl. ¶ 157.)

the 1992 By–Laws are valid." (Crouter Ex. 117: Stipulation, dated April 24, 2001.) [10] On June 19, 2001—*i.e.,* eleven days after the Arbitration Award was issued—Alice Jung and Jerry Jung withdrew their objections to probate (*see* Withdrawal of All Objections of Alice Jung), ("Alice Jung ... hereby withdraws her Objections to Probate...."); Withdrawal of All Objections of Jaroslav Jung, ("Jaroslav Jung hereby withdraws his Objections to Probate ...."), and on October 16, 2001, the Surrogate's Court admitted the 1993 Will to probate. The Probate Decree concludes, in pertinent part, that (1) "the [1993] Will was duly executed;" (2) "the Testatrix, at the time of executing it, was in all respects competent to make a Will, and not under restraint;" and (3) "the Court [is] satisfied of the genuineness of the [1993] Will and the validity of its execution." (Probate Decree at 2.)

**Liechtenstein Arbitration Proceedings**

On June 30, 1998, Anturia notified certain of the beneficiaries under the 1992 and 1998 By-laws (including Miroslav and Jerry Jung) of the approximate amounts they would be receiving from Anturia. (*See* Crouter Exs. 13–16; Def. 56.1 ¶ 21.) In July 1999, counsel to Anturia and the Trustees of the Inter Vivos Trust (*i.e.,* Neschis and Diamond) negotiated an agreement which precipitated the Liechtenstein Arbitration ("Arbitration Agreement"). (Crouter Ex. 61: Arbitration Agreement, dated July 8, 1999.) The Arbitration Agreement stated that "[t]here is a dispute between the members of the Board of the Anturia Stiftung and the Trustees on the question whether the Stiftung is—under the terms of its By[ ]-Law dated October 19, 1992—required to forwith [transfer] an amount equal to 58% of principal and income of the Stiftung to the Trustees." (*Id.* at 1.) The stated "purpose" of the Arbitration Agreement was, among other things, "to set forth the terms and conditions under which an arbitration proceeding to be initiated by [the Trustees] versus the Anturia Stiftung ... will be conducted." (*Id.*)

On or about July 16, 1999, the Trustees delivered to Anturia a "Notice For Arbitration" "invok[ing]" the arbitration clause as set forth under Article 13" of the Anturia Charter, "appointing" Claudia Kalin–Nauer, a Liechtenstein attorney, as an arbitrator, and stating that the Trustees "intend to seek an award" ordering Anturia to pay the Inter Vivos Trust 58% of Anturia's assets pursuant to the 1992 and 1998 By-laws.[11] (Crouter Ex. 63: Notice For Arbitration.) In a letter, dated August 13, 1999, Anturia, as the "defending party" in the Arbitration, designated Dr. Ernst F. Schmid, a Liechtenstein attorney, as the second arbitrator. (Crouter Ex. 64.) Thereafter, Anturia and the Trustees approached Dr. Peter Monauni to serve as the third arbitrator or "Arbitration Chair." (Crouter Ex. 64; Crouter Ex. 55: Deposi-

---

10. In an April 13, 2001 letter to Surrogate's Court, after the Liechtenstein Arbitration hearings had concluded but before issuance of the June 8, 2001 Award, the Jungs' counsel, Henry Gradstein, stated: "if the [Arbitration] tribunal finds that Natasha Gelman *did* have mental capacity in late 1992, then it is a fair inference that she had capacity in April 1993 when the Last Will was executed and, more importantly, when the 1990 Will was executed, which is also at issue. Whether or not such a finding would have collateral estoppel or res judicata effect, **our clients would** have no desire to proceed with the Will contest if another adjudicative body has already determined that Natasha Gelman had sufficient mental capacity to execute a change of beneficiaries in 1992." (Crouter Ex. 115 (emphasis added).)

11. Because Elizabeth Jung predeceased Mrs. Gelman, Jung's 1% share under the 1992 By-laws devolved to the Trust, raising the Trust's share from 57% to 58%.

tion of Peter Monauni, dated September 30, 2004 ("Monauni Dep."), at 48–49.) Mr. Monauni, a Liechtenstein attorney, declined the appointment because he had already been retained by Weizmann. (Monauni Dep. at 49 ("I learned that the defendant was the Anturia Foundation and then I had a conflict of interest" because "I was representing the Weizmann Institute.").) By August 26, 1999, Anturia and the Trustees had "agreed to" designate Dr. Sigrid Launois–Mayer, also a Liechtenstein attorney, as Arbitration Chair, and Dr. Launois–Mayer was, thereafter, formally "appointed" by the other two arbitrators. (Crouter Exs. 64–65; *see* Crouter Ex. 66: Decision of the Court of Arbitration, dated Sept. 21, 1999 ("The arbitration judges unanimously selected Mrs. Sigrid Launois–Mayer, J.D, Vaduz, to be the presiding umpire.").) [12]

On or about January 12, 2000, Anturia filed its arbitration "Answer" challenging the validity of the Inter Vivos Trust and stating that "it is conceivable *arguendo* that [the Anturia Board] acted mistakenly, if it turns out that [Mrs. Gelman] was incompetent." (Crouter Ex. 82: Answer at 8.) That same day, Anturia also served a notice "impleading" into the Arbitration Miroslav, Jerry, Monica (Michelle), and Josef Jung, as well as Weizmann and "The Metropolitan Museum." (Crouter Ex. 81: Third Party Notice, dated Jan. 12, 2000 ("Since an essential question in the present arbitration proceedings will be whether the By–Laws ... issued by the foundation council dated 19.10.1992 and 27.01.1998 are valid or not, the defendant is hereby impleading the beneficiaries named in the heading and named in the By–Laws....").) [13]

On or about March 20, 2000, Weizmann entered the Liechtenstein Arbitration by filing an arbitration "Joinder" ("Weizmann Joinder") stating, in pertinent part: "we have a legal interest in seeing [Anturia] prevail, and we therefore join [Anturia] as an intervening third party." (Def. 56.1 ¶ 199; Crouter Ex. 97: Weizmann Joinder at 1.) On or about March 21, 2000 and July 28, 2000, Josef, Michelle, and the Estate of Miroslav Jung (but not Jerry Jung) (together with Weizmann, the "Intervenors") entered the Arbitration ("Jung Joinder") as "intervener[s] with full-party status," and argued, among other things, that the 1992 By-laws "do not reflect the intent of Jacques and Natasha Gelman" and "were

**12.** (*See* Ex. 85: Fax, dated Feb. 1, 2000, from Weizmann's counsel Dr. Dieter Hofmann stating "it seems important to know that all three arbitrators enjoy a good reputation so that the Institute can trust to obtain a fair decision".) It appears that the Jungs may have chosen, for strategic reasons, not to commence the arbitration. By October 21, 1998, the Jungs had retained Liechtenstein arbitration counsel, Dr. Andreas Schurti, who prepared (but did not file) a draft arbitration demand. (*See* Crouter Ex. 41.) The Jungs' counsel warned: "I would like to stress once again that there is a considerable risk that the injunction will not be granted or that we will lose the arbitration proceedings. In the worst case, our clients would lose the share of Miroslav Jung and would have to pay all the costs of the proceedings." (Crouter Ex. 41: Schurti fax, dated October 21, 1998; *see also* Award at 2.) But when the Surrogate's Court ruled on March 28, 2000 that the Jungs lacked standing (*see* Ex. 94: March 28, 2000 Probate hearing transcript), the Jungs' counsel advised that "the time has come to commence a full-court press and take any and all steps required in the [Liechtenstein] arbitration proceeding to protect our interest." (Ex. 95: Letter, dated March 29, 2000.)

Weizmann independently retained the first of several European counsel on March 8, 1999, over four months before the Arbitration commenced on July 16, 1999. (Crouter Ex. 50.)

**13.** Michelle Jung is sometimes referred to as "Monica" or "Monika" Jung. (Crouter Ex. 104: Minutes of Arbitration Hearing, dated Sept. 13, 2000, at 3.)

adopted at a time when Natasha was suffering from Alzheimer's Disease and was subject to the undue influence of" Neschis, Diamond, and Littman. (Def. 56.1 ¶¶ 201–02, 207; Crouter Exs. 98, 100 at 11.) The Arbitration Tribunal granted the intervention of Weizmann and the Jungs on September 13, 2000, over the objection of the Trustees. (*See* Minutes of Arbitration Hearing, dated Sept. 13, 2000, at 4; Def. 56.1 ¶ 215.) "[D]uring the arbitration proceedings the intervening parties made ... applications in contradiction and against ... [Anturia], and maintained their positions during the arbitral proceedings and expressly claimed to be interveners under Article 20 CCPL [the Liechtenstein Code of Civil Procedure] having full party status." (Crouter Ex. 139: Affirmation of Dr. Werner Melis, dated Dec. 7, 2004 ("Melis Aff."), ¶ 40.) The Tribunal ultimately classified Weizmann and the Jungs as "joined parties as defined in § 20" CCPL, having "full party status" and the power, which they exercised, to offer arguments and evidence contradicting Anturia's position. (Award at 30–32, 41; Def. 56.1 ¶¶ 301, 347.)

On November 19, 2001, the Jungs challenged Anturia's appointed arbitrator, Dr. Schmid, on the grounds that Dr. Schmid allegedly was biased towards Anturia. (*See* Crouter Ex. 120; Def. 56.1 ¶¶ 329–31.) The Tribunal denied this challenge on December 13, 2001, ruling that, among other

things, "personal or other reasons for an alleged impartiality on the part of Arbitration Judge Dr. Schmid were ... not substantively shown to exist...." (*See* Crouter Ex. 122; Def. 56.1 ¶¶ 333–38.) [14]

In advance of the Arbitration evidentiary hearings, the parties filed extensive "pleadings" containing legal and factual argument and proof. (*See* Award at 3–7; Crouter Ex. 76: Trustee Complaint, dated Oct. 14, 1999; Crouter Ex. 82: Anturia's Answer and Interlocutory Motion for a Determination, dated Jan. 12, 2000; Crouter Ex. 81: Anturia Third–Party Notice, dated Jan. 12, 2000; Crouter Ex. 96: Trustee Preliminary Pleading, dated Feb. 17, 2000; Crouter Ex. 97: Weizmann Joinder and Answer with Preliminary Pleadings, dated March 20, 2000; Crouter Ex. 98: Jung Joinder, dated March 21, 2000; Crouter Ex. 99: Anturia's Preliminary Pleading, Cross–Complaint, and Motion for Interlocutory Determination, dated April 18, 2000; and Crouter Ex. 100: Jung Answer to Complaint/Preparatory Brief, dated July 28, 2000.) [15]

On September 13, 2000 and November 30, 2000, the Tribunal held evidentiary hearings (Def. 56.1 ¶¶ 211–82), at which Weizmann was represented by Dr. Monauni and Dr. Dieter Hofmann, and the Jungs were represented by Dr. Andreas Schurti and Dr. Nicolas Reitner. (Crouter Exs.

---

14. Weizmann and the Jungs failed to appeal this or any other aspect of the Arbitration or the Award to any Liechtenstein judicial court, despite having the right of appeal. (*See* Def. 56.1 ¶¶ 322–24, 326, 339; Melis Aff. ¶ 19 (If an "intervener finds, for instance, that an arbitral tribunal has accorded him against the provisions of the law only an inferior status, that it has wrongfully rejected a challenge of an arbitrator, or that an arbitral tribunal has rejected evidence or has committed other serious procedural mistakes, it has the possibility to initiate setting aside proceedings at the competent court in Liechtenstein ... within

the [statutory three month] time limits.... If it fails to do so, the award becomes definitely final and binding....").)

15. On March 20, 2000, Weizmann requested that the "arbitration proceedings be discontinued until a final and absolute decision has been reached" in the Probate Proceedings. (Crouter Ex. 97: Weizmann Joinder, dated March 20, 2000.) The Tribunal denied the request on September 13, 2000. (Crouter Ex. 104: Minutes of Hearing, dated Sept. 13, 2000, at 4.)

104, 111.) [16] Testimony (live and/or written) was received into the record from no fewer than 17 witnesses. Weizmann and the Jungs presented (live) testimony of Levis and Mr. Fritz Hochner, a former director of Credit Suisse. (Def. 56.1 ¶ 217; *see* Crouter Ex. 101: Weizmann "Notification," dated Aug. 29, 2000 (requesting that the Tribunal hear testimony from Levis and Hochner).) The Tribunal also heard (live) testimony from Diamond, Neschis, and Dr. Martin Escher (one of Anturia's Board members) (Def. 56.1 ¶¶ 238, 242, 256–257), who were cross-examined by counsel for Weizmann and the Jungs (Def. 56.1 ¶¶ 240–41, 246–47, 261–62); it received the deposition testimony of Littman, Diamond, Neschis, Fred Plum, M.D. (a neurologist who examined Mrs. Gelman in March 1995; *see* Award at 18; Weizmann Compl. ¶ 23), and Mary Chambers (who cared for Mrs. Gelman in 1991 following a knee operation; Award at 20) (*see* Award at 8–12; Def. 56.1 ¶¶ 238, 242). In lieu of live or deposition testimony, the Tribunal admitted affidavits from at least nine other witnesses. (Award at 8–12, 18–19, 28); *accord* (Transcript of Arbitration Hearing, dated Nov. 30, 2000, at 33; Def. 56.1 ¶ 281.) The Tribunal admitted written "opinions" from at least eight medical or legal experts on a variety of subjects, including, among other things, Mrs. Gelman's medical and mental condition. (Award at 8–12.) Weizmann and the Jungs also proffered, and the Tribunal admitted and considered, voluminous documentary evidence. (Def. 56.1 ¶¶ 211–82; *see* Award at 8–12 (cataloguing documents considered).) [17]

After the September 13, 2000 hearing and in advance of the November 30, 2000 hearing, the Jungs and Weizmann filed "Preliminary Written Statements" on November 21, 2000 and November 24, 2000, respectively, analyzing the relevant evidence. (*See* Def. 56.1 ¶¶ 251, 254; Crouter Ex. 111: Minutes of Nov. 30, 2000 hearing, at 3; Crouter Ex. 110: Weizmann's "Preliminary Written Statement," dated Nov. 24, 2000.) The Jungs and Weizmann also filed substantial post-hearing briefs. (*See* Crouter Ex. 112: Jungs' Post-hearing Brief, dated Dec. 14, 2000; Crouter Ex. 113: Weizmann's Post-hearing Brief, dated Dec. 28, 2000.)

The Liechtenstein Arbitration appears to have been a thorough and professional proceeding in accordance with the terms of the Charter and Liechtenstein law.[18] On or about June 8, 2001, the Tribunal issued its lengthy Award concluding, among other things, that the 1992 By-laws were legally valid (Award at 51) because "at the time [Mrs. Gelman] signed her instructions," *i.e.*, on June 5, 1992 and September 29, 1992 (Award at 15), she "possessed testamentary capacity" under Liechtenstein law (which the Tribunal compared to New York law, Award at 34–35, citing *Rudolf Nureyev Dance Foundation v. Noureeva–Francois*, 7 F.Supp.2d 402 (S.D.N.Y.1998)), and was not "unduly influenced by a third

---

16. Prior to and throughout the Arbitration proceedings, Weizmann and the Jungs were also represented by lawyers in Liechtenstein, Switzerland, and the United States.

17. The Tribunal recorded the September 13, and November 30, 2000 evidentiary hearings in written summaries (totaling 72 pages) rather than verbatim transcripts. (*See* Exs. 104, 111.)

18. And, on April 17, 2001, the Jungs represented to the New York Surrogate's Court that "[o]ver a dozen witnesses appeared [at the Liechtenstein Arbitration] by live testimony or affidavit regarding the question of Natasha Gelman's mental capacity, and this list includes virtually all of the witnesses that we would call in our case-in-chief" in the Probate Proceedings. (Crouter Ex. 116: Henry Gradstein fax to Surrogate's Court.)

party" (Award at 35; *accord id.* at 39; *see id.* at 17–18 ("all the circumstances ... clearly indicate that [Mrs. Gelman's 1992 instructions to the Anturia Board] reflect her true wishes and intentions")). The Tribunal found that "[t]estamentary incapacity is to be assumed only when a substantial deterioration of mental capacities leads to mental disorientation." (Award at 33–35.) In support of its findings, the Tribunal cited, among other evidence, a letter (Jerry Jung Aff. Ex. F), dated January 8, 1992, from Samuel Rapoport, M.D., a New York physician "who examined [Mrs.] Gelman for a memory disorder" (Jerry Jung Aff. at 6), stating "that a rational conversation took place between the doctor and Mrs. Gelman, her long [term] memory was functioning, and her cognitive state appeared normal. Only certain limitations in short term memory were noticed." (Award at 24.) The Tribunal concluded from a December 1992 telephone conversation Mrs. Gelman had with Fritz Hochner (a former director of Credit Suisse) that Mrs. Gelman was then capable of "deliberations and abstract planning ... and thus an ability which ... a person no longer possesses in the advanced stages of [Alzheimer's]." (Award at 24.) And, "[i]n October 1993 Dr. Escher [of Anturia's Board] had personal contact with Natasha Gelman for the first time and ... obtained a good impression of her personality"— engaging in a conversation that showed Mrs. Gelman's "ability to think abstractly and to formulate plans for the future." (Award at 25.) [19]

The Tribunal found that, while testamentary capacity is appropriately determined at the time of execution, "[s]ome of the [Arbitration] witnesses [who claimed Mrs. Gelman was incompetent] refer their observations to a period of time after 1992 or provide extremely vague information concerning the important time frame." (Award at 19 (citations omitted).) Relatedly, the Tribunal found "a huge difference between" (1) Levis' affidavit, dated April 12, 1999, stating that Mrs. Gelman "was no longer mentally competent" at their Spring 1992 meeting (Levis Aff. ¶ 8), and (2) Levis' live testimony at the Arbitration that "Mrs. Gelman appeared to her to be fairly unfocused during the one-half to one hour meeting, and that she had the feeling that" Mrs. Gelman "was no longer her 'old self'" (Award at 22 (quoting Levis)).

With regard to the 1992 By-law changes that reduced the Jungs' and Weizmann's respective shares, the Tribunal noted that "at various earlier times not inconsiderable changes were sometimes made with respect to beneficiaries; various persons and institutions were omitted and others were added." (Award at 26.) "The same applies" to Mrs. Gelman's wills, which, in 1989 and 1990, reduced the Jungs' collective bequests from a total of $2 million to $20,000. (Award at 26–27.) As for the designation of Neschis and Diamond as executors of the 1993 Will and trustees of the Testamentary and Inter Vivos Trusts, the Tribunal observed that Neschis and Diamond "had already for many years been involved with estate planning and consultation concerning the will provisions of Mr. and Mrs. Gelman and later Natasha Gelman alone, and were always designated to be executrices and/or trustees." (Award at 27.) Regarding "[t]he increase

---

**19.** The Tribunal also observed that Mrs. Gelman's separate "Mexican last will and testament, dated August 16, 1993," which disposed of certain property located in Mexico, was signed by three "disinterested witnesses" and certified by a notary who swore that Mrs. Gelman "'has full use of reason, has full use of judgment, that she in not under pressure or violence, she has no lack of capacity, and that she expressed her will with understandable voice, clearly and conclusively....'" (Award at 26 (citations omitted).)

of Robert Littman's beneficial share in the 1992 by-laws from the earlier 1% to 31%," the Tribunal concluded that "[a]fter the death of her husband Natasha Gelman had obviously adapted the most important aspects of her life around her significant collection of paintings, and in this regard Robert Littman was able to assist her in all respects as an advisor as well as an administrator. Thus, it does not appear unusual to the arbitration court that Natasha Gelman wished to recognize in a financial way not only the personal relationship but also the assistance provided to her." (Award at 28–29.) The Tribunal also found that "Natasha Gelman obviously stated on many occasions that she no longer wanted the Weizmann Institute to be considered a beneficiary" because, as she told Hochner (a witness called by Weizmann, *see* Crouter Ex. 101), Weizmann "was in any case receiving bequests from everywhere in the world...." (Award at 23; Def. 56.1 ¶ 307.)

The Tribunal also concluded that Anturia's Board promulgated the 1998 By-laws "based on the legal and tax considerations presented to the board by Janet Neschis, and not on a special instruction from or in fulfillment of the wishes of Natasha Gelman." (Award at 39.) Mrs. Gelman's signed declaration of agreement to the 1998 by-laws was merely a "customary formal precaution." (*Id.*) Thus, Mrs. Gelman's competency in 1998 was deemed irrelevant to the validity of the 1998 By-laws. (*Id.*)

The Tribunal also found that Weizmann and the Jungs lacked standing to contest the validity of the 1997 Inter Vivos Trust, because if it "were actually non-existent or if it were declared void, the benefit would not fall to [Weizmann and the Jungs] ... but to the testamentary Jacques and Natasha Gelman trust," of which Weizmann and the Jungs were not beneficiaries. (Award at 48–49.)

## III. Legal Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *BBS Norwalk One, Inc. v. Raccolta, Inc.*, 117 F.3d 674, 676 (2d Cir.1997). The Court must "constru[e] the record in the light most favorable to the non-moving party and draw[ ] all inferences in that party's favor." *Boguslavsky v. Kaplan*, 159 F.3d 715, 719 (2d Cir.1998).

The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (internal quotation marks and citations omitted); *BBS*, 117 F.3d at 676. A genuine issue of material fact exists if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

■ "[I]f a party participates in arbitration proceedings without making a timely objection to the submission of the dispute to arbitration, that party may be found to have waived its right to object to the arbitration." *Opals on Ice Lingerie v. Body*

*Lines Inc.,* 320 F.3d 362, 368 (2d Cir. 2003).[20]

In resolving a Fed.R.Civ.P. 12(b)(6) motion to dismiss, the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996). A complaint should not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). This standard applies equally to RICO claims. *See NOW v. Scheidler,* 510 U.S. 249, 256, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994).

At the same time, while "the well-pleaded material allegations of the complaint are taken as admitted ... conclusions of law or unwarranted deductions of fact are not admitted." *First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 771 (2d Cir.1994) (citation omitted). Where, as here, a complaint alleges fraud, the pleading requirements of Fed.R.Civ.P. 9(b) apply. *Id.* In resolving a motion to dismiss, "a court may consider 'documents attached to the complaint as an exhibit or incorporated in it by reference, ... matters of which judicial notice may be taken, or ... documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit.' " *Chambers v.*

*Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002) (citation omitted).

## IV. Analysis

### A. Summary Judgment Motion

#### 1. Standing

Defendants argue that because "Jerry Jung is named as an Anturia beneficiary solely in the 1992 By–Laws, which the Jungs claim are invalid ... he has suffered no 'injury in fact' " and thus "should be dismissed as a plaintiff." (Def. Mem. at 4 n. 4 (citations omitted).) Plaintiffs do not appear to address the issue.

■ A "plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). According to Plaintiffs, Jerry Jung is a named beneficiary "solely under the 1992 By–Laws; he is not listed in the 1991 or 1989 By–Laws." (Def. 56.1 ¶ 190; Jung 56.1 ¶ 190; Weizmann 56.1 ¶ 190.) Jerry Jung, thus, lacks standing to attack the validity of the 1992 By-laws because he would not benefit from a finding that the 1992 By-laws were invalid. *See Matter of Brumer,* 69 A.D.2d 438, 444, 419 N.Y.S.2d 155, 158 (2d Dep't) (" 'In order ... to contest it is imperative that the legatee or devisee be prejudiced by the admission of the will to probate. If the beneficiary would receive less under a pri-

---

20. *Accord Gvozdenovic v. United Air Lines, Inc.,* 933 F.2d 1100, 1105 (2d Cir.1991) ("Although a party is bound by an arbitral award only where it has agreed to arbitrate, an agreement may be implied from the party's conduct," such as participation in the arbitration without objection.); *see also Pike v. Freeman,* 266 F.3d 78, 89 (2d Cir.2001) ("Arbitration is not a trial run in which a party may sit quietly by without raising pertinent issues, wait to see if the result is in his favor and then seek judicial relief as an afterthought...."); *ConnTech Development Co. v.*

*University of Connecticut Educ.,* 102 F.3d 677, 685 (2d Cir.1996) ("An objection to the arbitrability of a claim must be made on a timely basis, or it is waived."); *International Longshoremen's Ass'n v. West Gulf Maritime Ass'n,* 594 F.Supp. 670, 674 (S.D.N.Y.1984) ("One who voluntarily participates in arbitration will not thereafter be heard to complain that the arbitrator was without authority to act."); *National Cash Register Co. v. Wilson,* 8 N.Y.2d 377, 382–83, 208 N.Y.S.2d 951, 955, 171 N.E.2d 302 (1960).

or will or the same amount, then he or she is not entitled to object.' " (citation omitted)), *appeal dismissed*, 48 N.Y.2d 667, 421 N.Y.S.2d 879, 397 N.E.2d 390 (1979); 41 *N.Y. Jur.2d* Decedents' Estates § 1776 (2005).

### 2. Collateral Estoppel

#### a. Convention on Recognition and Enforcement Of Foreign Arbitral Awards of June 10, 1958

Plaintiffs contend that "no United States court may recognize or enforce an arbitration decision rendered in a foreign state that is not a signatory to the Convention on Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958." (Pl. Mem. at 5.) According to Plaintiffs, "the Convention preempts all other law governing recognition and enforcement of foreign arbitration decisions and precluded recognition, for any purpose, of an arbitration award rendered in Liechtenstein." (Pl. Mem. at 5–6.) Further, Defendants "were free to seek confirmation of the [Award] as a judgment in Liechtenstein judicial proceedings but chose not to do so." (Pl. Mem. at 9.)

Defendants counter that, among other things, "Liechtenstein is not a 'Contracting State'; thus, the Convention does not apply here. The Convention only governs mandatory recognition of awards from Contracting States; it does not *prohibit* recognition of foreign arbitration awards that fall outside its scope." (Def. Mem. at 2.) Defendants also argue that foreign arbitral awards are recognized in the United States " 'whether or not they have been judicially confirmed in the state where made' " (Def. Reply at 1), and that "under Liechtenstein law arbitral awards have the same effects as judgments" (Crouter Reply Declaration, dated March 18, 2005 ("Crouter Reply Decl."), Ex. 3: Reply Af-

firmation of Dr. Helmut Heiss, dated March 16, 2005 ("Heiss Reply Aff."), ¶ 4).

 The Convention "governs judicial confirmation of arbitration decisions that arise out of agreements between a U.S. citizen and a citizen of a foreign nation that signed the convention." *Publicis Commc'n v. True North Commc'ns, Inc.*, 206 F.3d 725, 728 (7th Cir.2000). The Convention does not appear to preempt all other law governing the recognition of foreign arbitral awards or to bar the recognition of awards not falling under the Convention, including awards from non-signatory states such as Liechtenstein.

Until 1970, when the United States adopted the [Convention], the enforcement of foreign country awards (as well as the enforcement of arbitration agreements) was largely based on what amounted to, in fact, judicially fashioned concepts of comity. . . . [T]here are still many circumstances in which [the Convention's] provisions do not apply and instances where already existing practice is important for purposes of interpretation of the law. . . . Among the reasons that actions to enforce foreign awards are brought outside the framework of the . . . Convention are that the country where the award was rendered is not a party to the Convention. . . .

2 *Domke on Commercial Arbitration* § 50:2 & n. 20 (2005); *accord Restatement (Third) of Foreign Relations Law* § 487 cmt. h (1987) ("Foreign arbitral awards not falling under the Convention are generally enforceable in the United States in the same manner as foreign judgments . . . whether or not they have been judicially confirmed in the state where made."); 4 I. MacNeil, R. Speidel, & T. Stipanowich, *Federal Arbitration Law* § 44.9.1.8 (1995); *see also Cortez Byrd Chips. Inc. v. Bill Harbert Const. Co.*, 529 U.S. 193, 202–03, 120 S.Ct. 1331, 146 L.Ed.2d 171 (2000).

This result comports with the state and federal policies favoring the arbitration of disputes. *See, e.g., Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983); *see also Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 631, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985) ("the emphatic federal policy in favor of arbitral dispute resolution ... applies with special force in the field of international commerce").[21]

 Collateral estoppel bars a party from relitigating "an issue which has previously been decided against him in a proceeding in which he had a fair opportunity to fully litigate the point." *Khandhar v. Elfenbein*, 943 F.2d 244, 247 (2d Cir.1991); *accord Conte v. Justice*, 996 F.2d 1398, 1400 (2d Cir.1993). Collateral estoppel, also referred to as "issue preclusion," applies "when an issue was necessarily and conclusively determined in a prior proceeding and the party to be bound had a full and fair opportunity to litigate the issue." *Sassower v. Abrams*, 833 F.Supp. 253, 264–65 (S.D.N.Y.1993). "Two requirements must be met before the doctrine will preclude a subsequent litigation: 'First, the identical issue necessarily must have been decided in the prior action and be decisive of the present action, and second, the party to be precluded from relitigating the issue must have had a full and fair opportunity to contest the prior determination.'" *Khandhar*, 943 F.2d at 247 (citation omitted). "In addition, a court must satisfy itself that application of the doctrine is fair." *Bear, Stearns & Co., Inc., Bear, Stearns Secs. Corp. v. 1109580*, 409 F.3d 87, 91 (2d Cir.2005).[22] "The party seeking the benefit of collateral estoppel bears the burden of proving the identity of issues, while the party challenging its application bears the burden of showing that he or she did not have a full and fair opportunity to adjudicate the claims involving those issues." *In re PCH Assoc.*, 949 F.2d 585, 593 (2d Cir.1991). "The doctrine, however, is a flexible one, and the enumeration of these elements is intended merely as a framework, not a substitute, for case-by-case analysis of the facts and realities." *Buechel v. Bain*, 97 N.Y.2d 295, 304, 740 N.Y.S.2d 252, 257, 766 N.E.2d 914 (2001). "In the end, the fundamental inquiry is whether relitigation should be permitted in a particular case in light of ... fairness to the parties, conservation of the resources of the court and the litigants, and the societal interests in consistent and accurate results. No rigid rules are possi-

---

**21.** "The preclusive effect of an arbitration Award depends on the basis of the federal court's subject matter jurisdiction." *In re Drexel Burnham Lambert Group, Inc.*, 161 B.R. 902, 906 (S.D.N.Y.1993). "New York law determines the applicability of the doctrine of collateral estoppel in [a] diversity action," *Norris v. Grosvenor Mktg. Ltd.*, 803 F.2d 1281, 1285 (2d Cir.1986), while "federal law determines the preclusive effect to be given" in federal question cases, *In re Drexel*, 161 B.R. at 906; *see Weizmann Institute of Science v. Neschis*, 229 F.Supp.2d 234, 249 (S.D.N.Y.2002) ("New York's choice of law rules govern Plaintiffs' (non-RICO) claims which are premised on diversity and supplemental jurisdiction."). Although Plaintiffs assert both federal and state law claims, "issue preclusion ... operates almost identically un-

der federal and New York State law." *M.J. Woods, Inc. v. Conopco, Inc.*, 271 F.Supp.2d 576, 580 (S.D.N.Y.2003).

**22.** Federal courts also state the elements of issue preclusion as follows:

(1) the issues of both proceedings must be identical, (2) the relevant issues [must have been] actually litigated and decided in the prior proceeding, (3) there must have been "full and fair opportunity" for the litigation of the issues in the prior proceeding, and (4) the issues [must have been] necessary to support a valid and final judgment on the merits.

*Leather v. Eyck*, 180 F.3d 420, 425–26 (2d Cir.1999).

ble, because even these factors may vary in relative importance depending on the nature of the proceedings...." *Id.* (citation omitted). Collateral estoppel applies to issues resolved in arbitration, assuming there has been a "final determination on the merits, notwithstanding a lack of confirmation of the award." *Jacobson v. Fireman's Fund Insurance Co.*, 111 F.3d 261, 267–68 (2d Cir.1997) (citation and internal quotation marks omitted).[23]

### b. The Requirements of Collateral Estoppel Have Been Satisfied With Respect To Mrs. Gelman's Testamentary Capacity

#### i. Identity of Issues

■ Plaintiffs argue that "there is no identity of issue between the matters necessarily decided by the Arbitration Panel and the issues raised in the Amended Complaint" because: (1) " 'the arbitration panel was unable to determine that Natasha Gelman's mental capacities were ... diminished' " (Pl. Mem. at 16–17 (quoting Award at 28)) and the panel "concluded that it could not determine one way or another whether Mrs. Gelman was mentally incompetent or subjected to undue influence" (*id.* at 16); (2) the Award only resolved "whether Anturia's procedures were followed in connection with enacting the 1998 by-laws" and did not involve Plaintiffs' tort claims, "whether Neschis, Diamond and Littman took advantage of Mrs. Gelman" (*id.* at 16–17).

Defendants counter that: (1) the "claims in both Complaints are predicated upon the factual issues at the heart of the arbitration," including "whether in 1992 Mrs. Gelman had testamentary capacity and acted freely to request the 1992 By–Laws amendments" (Def. Mem. at 3 (citing

Crouter Ex. 127: Defendants' Joint Memorandum of Law in Support of Their Motion to Dismiss, at 4–5)); (2) "Plaintiffs have turned the meaning of the Tribunal's language on its head" (Def. Reply at 6–7); and (3) Plaintiffs "confuse res judicata (claim preclusion) with collateral estoppel (issue preclusion)," and "[a]ssuming identity of *issue,* collateral estoppel applies 'regardless of whether the two suits are based on the same cause of action' " (*id.* at 6 (citation omitted)).

■ The party claiming estoppel must show that "the identical issue necessarily must have been decided in the prior action and be decisive of the present action." *Khandhar,* 943 F.2d at 247 (citation and internal quotation marks omitted). "The prior decision need not have been explicit on the point, since '[i]f by necessary implication it is contained in that which has been explicitly decided, it will be the basis for collateral estoppel.' " *BBS,* 117 F.3d at 677 (citation omitted). "Nonetheless, the party asserting preclusion bears the burden of showing with clarity and certainty what was determined by the prior judgment," and "[i]ssue preclusion will apply only if it is quite clear that this requirement has been met." *Id.* (citations and internal quotation marks omitted). "To obtain summary judgment on collateral estoppel grounds" based on an arbitration award, "the defendants must make a showing so strong that no fair-minded jury could fail to find that the arbitrator necessarily denied the claim for the reason they assert." *Id.* This is a heavy burden that cannot be met with evidence that is "equivocal." *Id.*

The parties do not dispute that a central issue before both the Tribunal and this Court is whether Mrs. Gelman possessed

---

**23.** *Accord Boguslavsky,* 159 F.3d at 720; *BBS,* 117 F.3d at 677; *Benjamin v. Traffic Execu-* *tive Ass'n Eastern Railroads,* 869 F.2d 107, 113 n. 9, 114 (2d Cir.1989).

testamentary capacity at the time she signed instructions regarding the 1992 By-laws. After analyzing Liechtenstein law (which the Tribunal found comparable to New York law, Award at 34–35), the Tribunal found "on the basis of the evidentiary proceedings ... that Natasha Gelman possessed testamentary capacity as defined [under Liechtenstein law] at the time she signed her instructions ... which led to the promulgation of the 1992 by-laws." (Award at 34–35.)[24] And, this Court finds that the issue of Mrs. Gelman's testamentary capacity was necessarily decided by the Arbitration Award and is "decisive of the present action." *Khandhar,* 943 F.2d at 247. "Simply put, [Plaintiffs] fully argued [their incompetence] theory during [the] arbitration ..., and interests in finality demand that [they] not be given a second chance to raise the same issue here." *Id.* (*See also* Crouter Ex. 115: Letter, dated April 13, 2001, to the Surrogate's Court from the Jungs' counsel, Henry Gradstein ("[I]f the [Arbitration] tribunal finds that Natasha Gelman *did* have mental capacity in late 1992, then it is a fair inference that she had capacity in April 1993 when the Last Will was executed and, more importantly, when the 1990 Will was executed, which is also at issue.... **[O]ur clients would have no desire to proceed with the Will contest if another adjudicative body has already determined that Natasha Gelman had sufficient mental capacity to execute a change of beneficiaries in 1992.**" (emphasis added)).)

▮ The Court is not able to find, on the record presented, that Defendants have sustained their burden of showing with "clarity and certainty," *BBS,* 117 F.3d at 677, that the Arbitration Award necessarily and unambiguously decided the question of whether Defendants procured the 1992 By-laws through "fraud, duress and undue influence" under New York law. (*See, e.g.,* Jung Compl. Count I for Declaratory Relief (the 1992 By-laws "were wrongfully procured by Defendant(s) ... by fraud, duress and undue influence brought to bear on Mrs. Gelman after Mrs. Gelman was no longer of sound mind"); Weizmann Compl. Count I for Conversion ("The October 19, 1992 By–Laws and all subsequent by-laws were executed as a result of fraud, duress and undue influence ...."); *see also* Def. 56.1 ¶ 340.) Although the Tribunal stated that Mrs. Gelman was not "unduly influenced by a third party" (Award at 35; *accord id.* at 39), the Tribunal did not marshal supporting evidence (or law) for its finding. For the purposes of determining collateral estoppel, "[i]ssues of fact may bear the same label without being identical. They are not identical if the legal standards governing their resolution are significantly different." *Metromedia Co. v. Fugazy,* 983 F.2d 350, 365 (2d Cir.1992). Under New York law, for example, a finding of testamentary capacity does not necessarily preclude a finding of fraud or undue influence in the making of a will. *See In re Estate of Johnson,* 6 A.D.3d 859, 861, 775 N.Y.S.2d 107, 109 (3d Dep't 2004) (holding that although plaintiffs "failed to produce competent proof creating a factual issue regarding decedent's testamentary capacity" at the time will was executed, there were "triable issues regarding the allegations of undue influence and fraud").[25] *See*

---

**24.** Plaintiffs do not appear to assert that the standard for determining testamentary capacity is substantially different under Liechtenstein and New York law or that the Tribunal's finding of testamentary capacity is contrary to New York law.

**25.** "Factors considered relevant [under New York law] in determining whether undue in-

*also Hernandez v. City of Rochester*, 260 F.Supp.2d 599, 612 (W.D.N.Y.2003) (rejecting collateral estoppel where plaintiff failed to establish identity of issues).

### ii. Plaintiffs Were Afforded a Full and Fair Opportunity to Litigate the Issue of Mrs. Gelman's Testamentary Capacity

Defendants argue that the Arbitration proceedings were fair because, among other reasons: (1) "Plaintiffs raised no objections regarding the arbitrators (or their selection) until after the Award, and never appealed to a Liechtenstein court"; (2) "Plaintiffs seek the full benefit of Anturia's Charter, *i.e.*, enforcement of contingent beneficiary interests revoked by subsequent By–Laws, but refuse to be bound by the Charter's arbitration clause"; (3) "Plaintiffs complain about their third-party intervenor status, yet the undisputed record is that well before the Arbitration's commencement, Plaintiffs considered bringing their own proceedings against Anturia but each made the strategic decision not to do so"; (4) "Plaintiffs argue that they were 'prejudiced' as third party intervenors, but the record shows that they acted and were treated as full joint litigants during the Arbitration"; and (5) "[t]he Tribunal considered and rejected Plaintiffs' attempts to prove Mrs. Gelman was not competent." (Def. Reply at 1.)

Plaintiffs counter that the Arbitration was unfair because, among other reasons: (1) "any objection to being compelled to arbitration ... despite having never agreed to arbitration ... would have been futile in Liechtenstein because Liechtenstein law permits an arbitration clause to be enforced against non-signatories" (Pl. Mem. at 14–15); (2) "the arbitration was the result of collusion between the Trustees ... and the Anturia Foundation to conduct a 'sham' arbitration designed to exclude Weizmann and the Jungs from participating in the selection of the arbitrators and yield a fast decision ...." (*id.* at 10); (3) "[b]ecause it would have been futile to raise any objection to their exclusion from the selection of arbitrators, there has been no waiver" (*id.* at 12–13); (4) contrary to the Charter, which provides that "[e]ach party shall select one arbitrator, and these arbitrators shall then appoint a third arbitrator" (Crouter Ex. 1 at 6), "the chair of the arbitral panel was selected by the parties, not by the two arbitrators" (Pl. Mem. at 11 n. 5, 12); and (5) "the arbitration panel ignored, disregarded or rejected, on various pretexts, substantial evidence that Mrs. Gelman lacked mental capacity at the time the 1992 changes to the by-laws were being made" (*id.* at 12).

### (a) Waiver of Plaintiffs' Objections

The Court finds that Plaintiffs waived their objections to the Arbitration either by failing to raise them during the Arbitration and/or upon appeal to a Liechtenstein court. (*See* Def. 56.1 ¶¶ 322–24, 326, 339.) Under Liechtenstein, New York, and federal law, such failure to

fluence controlled the settlor in the creation of a trust include: (1) whether a trustee, beneficiary or a third party persuaded the settlor to create the trust; (2) the improvidence of the settlor in creating the trust; (3) whether the settlor had independent legal advice; (4) the age, health, business competence and intelligence of the settlor; and (5) whether it could be natural for a person in the position of the settlor to create such a trust when not

under the undue influence of third parties. While the general rule is that the party seeking to avoid a trust has the burden of proving undue influence, under the doctrine of constructive fraud, the burden may be shifted to the party defending the trust if the particular facts give rise to a suspicion that undue influence was exerted." *Harrison v. Grobe*, 790 F.Supp. 443, 456 (S.D.N.Y.1992), *aff'd*, 984 F.2d 594 (2d Cir.1993).

object or appeal works a waiver. (*See* Melis Aff. ¶ 19) (If an "intervener finds, for instance, that an arbitral tribunal has accorded him against the provisions of the law only an inferior status, that it has wrongfully rejected a challenge of an arbitrator, or that an arbitral tribunal has rejected evidence or has committed other serious procedural mistakes, it has the possibility to initiate setting aside proceedings at the competent court in Liechtenstein ... within the [statutory three month] time limits. . . . If it fails to do so, the award becomes definitely final and binding . . . ."); *accord id.* ¶ 18; *id.* ¶ 11 ("Intervening parties who enjoy the position of joint litigants have the same rights as the main parties to an arbitration. . . . If they fail to make the necessary applications, they lose their right to do so."); *see also Pike v. Freeman*, 266 F.3d 78, 89 (2d Cir.2001) (federal law); *J.P. Stevens & Co., Inc. v. Rytex Corp.*, 34 N.Y.2d 123, 129, 356 N.Y.S.2d 278, 282, 312 N.E.2d 466 (1974) (New York law).

As Plaintiffs acknowledge, "Liechtenstein law permits an arbitration clause to be enforced against non-signatories," including Plaintiffs. (Pl. Mem. at 15; *see* Melis Aff. ¶ 9 ("[A]rbitration clauses in the statute of a foundation in Liechtenstein are also binding for persons or entities claiming to be beneficiaries of the foundation on the basis of its by-laws, although they have not signed the Charter of the foundation or the arbitration clause contained therein.").) And, under New York and federal law, "[a]lthough a party is bound by an arbitral award only where it has agreed to arbitrate, an agreement may be implied from the party's conduct," such as Plaintiffs' full participation in the Arbitration without objection. *Gvozdenovic v. United Air Lines, Inc.*, 933 F.2d 1100, 1105 (2d Cir.1991) (finding implied

agreement based on non-signatories' "active and voluntary participation in the arbitration," where they had not "objected to the process, refused to arbitrate or made any attempt to seek judicial relief"); *accord Pike*, 266 F.3d at 85 n. 4; *Morfopoulos v. Lundquist*, 191 A.D.2d 197, 197–98, 594 N.Y.S.2d 234, 234–35 (1st Dep't 1993). Plaintiffs' active participation in the Arbitration, by, *inter alia*, filing briefs, introducing evidence, and cross-examining witnesses, without objection or appeal, constituted Plaintiffs' agreement to arbitrate. *Id.* (*See also* Award at 29 ("Neither the Parties nor Third Party Interveners challenged the jurisdiction of the arbitration court.").)

The Court does not credit Plaintiffs' argument that they were "forced" to arbitrate, because Plaintiffs could have preserved their objection(s) to arbitration simply by arguing to the Tribunal that it lacked authority to decide the matter. *See AGCO Corp. v. Anglin*, 216 F.3d 589, 593 (7th Cir.2000) ("If a party willingly and without reservation allows an issue to be submitted to arbitration, he cannot await the outcome and then later argue that the arbitrator lacked authority to decide the matter. If, however, a party clearly and explicitly reserves the right to object to arbitrability, his participation in the arbitration does not preclude him from challenging the arbitrator's authority in court.") (citation omitted); *see also Sarhank Group v. Oracle Corp.*, 404 F.3d 657, 662 (2d Cir.2005) (Defendant "objected repeatedly to its being a party to the [Egyptian] arbitration, thus preventing a finding that it waived its ability to object."); *Opals on Ice Lingerie v. Body Lines Inc.*, 320 F.3d 362, 368 (2d Cir.2003) (holding that although defendant "participated actively" in arbitration, fact that defendant "objected repeatedly to arbitration ... prevent[s]

**680**

a finding of waiver").[26]

The Court also does not credit Plaintiffs' argument that it would have been "futile," under the Charter and Liechtenstein law, "to raise any objection to their exclusion from the selection of arbitrators" (Pl. Mem. at 12–13; Monauni Decl. ¶ 32), presumably because the Trustees and Anturia were "fundamentally aligned together" and "colluded . . . to conduct a 'sham' arbitration designed to exclude Weizmann and the Jungs from participating in the selection of the arbitrators and yield a fast decision. . . ." (Pl. Mem. at 10, 12.) Such (alleged) collusion and misalignment of parties is prohibited by both the Charter and Liechtenstein law.[27] "[A]n arbitral award is invalid if," among other things, "legal or contractual provisions regarding the composition of the arbitral tribunal or the method of reaching a decision have been infringed," or "if the challenge of an arbitrator has wrongly been rejected. . . ." (Melis Aff. ¶ 13 (citing Article 612 CCPL); see Melis Aff. ¶ 11; Crouter Reply Decl. Ex. 2: Melis Reply Affirmation, dated March 7, 2005 ("Melis Reply Aff."), ¶ 5.) Even though Plaintiffs claim to have discovered collusion long before they intervened in the Arbitration (see, e.g., Ex. 67, dated September 27, 1999), they failed to object either at the Arbitration or in an appeal to Liechtenstein courts. As noted (supra, page 15 & n. 14), Plaintiffs made only one challenge—that Anturia's appointed arbitrator was biased towards Anturia—and Plaintiffs failed even to appeal that objection.

With respect to Plaintiffs' remaining allegations of procedural irregularities, i.e., that "the chair of the arbitral panel was selected by the parties, not by the two arbitrators" (Pl. Mem. at 11 n. 5, 12), and that the Tribunal "disregarded . . . substantial evidence that Mrs. Gelman lacked mental capacity" (id. at 12), Defendants correctly point out that these objections similarly were not raised during the Arbitration or on appeal (Melis Aff. ¶ 42 ("Counsel for the intervening parties did not according to the minutes of the hearing object to [the] procedural order [to hear certain witnesses by affidavit alone] at the hearing, nor in their post-hearing submissions . . . ."); see id. ¶ 43). "Arbitration is not a trial run in which a party may sit quietly by without raising pertinent issues, wait to see if the result is in his favor and then seek judicial relief as an afterthought. . . . As respondent . . . did not raise this issue during the arbitration before the panel, he has waived the right to do so." Pike, 266 F.3d at 89.

**(b) Fairness of Arbitration Proceedings**

The Court finds, for the reasons stated above and based upon a review of the Arbitration record and the parties' submissions, that Plaintiffs were afforded "a full and fair opportunity to adjudicate" the issue of Mrs. Gelman's testamentary capacity. In re PCH Assoc., 949 F.2d 585, 593 (2d Cir.1991).[28] The following additional considerations support this conclusion.

---

**26.** See In re Russell, 109 B.R. 359, 361 (Bankr.W.D.Ark.1989) ("If a nonparty could have intervened in a prior proceeding, but chose not to, he will not be bound by the prior judgment.").

**27.** (Melis Aff. ¶ 11 (Under Liechtenstein law, "an arbitrator may be challenged for the same reasons that a judge may be challenged. . . . [A]ll arbitrators, including the ar-

bitrators who have been appointed by a party, have to be and remain impartial and independent of the parties during the arbitral proceedings.").)

**28.** The Court also finds that it would be unfair and wasteful of judicial resources to relitigate the issue of Mrs. Gelman's testamentary capacity. See Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326, 99 S.Ct. 645, 58 L.Ed.2d 552

For one thing, there is some evidence that before the Arbitration began, Plaintiffs had the opportunity to commence— and, in fact, considered commencing—an arbitration under the Charter with the concomitant right to appoint arbitrators. They apparently chose not to do so for strategic reasons. (*See* page 14 n. 12, *supra.*) Second, there is also little basis in the record—apart from Plaintiffs' unsupported allegations—to find that the arbitrators colluded or were biased. To the contrary, all three arbitrators appear to have had excellent reputations (*see* Ex. 85: Fax, dated Feb. 1, 2000, from Weizmann's own counsel Dr. Dieter Hofmann stating "it seems important to know that all three arbitrators enjoy a good reputation so that the Institute can trust to obtain a fair decision"). And, Plaintiffs appear to have been content with the Arbitrators' performance up until the time that the Award was issued (*see* Ex. 18: Jerry Jung Dep. at 234–35 (when Jerry Jung received the Award his "views shift[ed] from the proceeding being fair to the proceeding being ... crooked").) Third, according to the unrebutted testimony of Dr. Werner Melis, Defendants' expert in Liechtenstein law, the method of choosing the Tribunal Chair did not violate the Charter, because "[e]ven if there might have been an exchange of possible names for the chairman between the arbitrators appointed by the parties and the parties, which is not unusual in international arbitration, only the arbitrators appointed by the parties can appoint the chairman." (Melis Reply Aff. ¶ 4.) Fourth, throughout the Arbitration proceedings, Plaintiffs conducted themselves (and were treated) as "joint litigants" with full party status under Article 20 CCPL, a status the Tribunal acknowledged in the Award. (*See* page 15, *supra.*; Melis Aff. ¶ 40 ("[D]uring the arbitration proceedings the intervening parties made and continued to make applications in contradiction and against ... [Anturia], and maintained their positions during the arbitral proceedings and expressly claimed to be interveners under Article 20 CCPL having full party status....").) Fifth, the Tribunal's decision to forego live testimony in favor of affidavits from some witnesses is common practice, *see Matter of Arbitration between InterCarbon Bermuda, Ltd. and Caltex*, 146 F.R.D. 64, 72–74 (S.D.N.Y. 1993) (confirming award even though arbitration panel refused to hear any live testimony); *Blue Tee Corp. v. Koehring Co.*, 754 F.Supp. 26, 31 (S.D.N.Y.1990) (" 'In handling evidence an arbitrator need not follow all the niceties observed by the federal courts. He need only grant the parties a fundamentally fair hearing.' "), and does not appear unreasonable, as the Tribunal explained (*see* Award at 28 ("It was possible to forego taking the testimony of the witnesses and experts offered by Third Party Intervenors because the arbitration court admitted into evidence and evaluated the written statements of the proferred witnesses. Also, the Parties submitted a number of expert opinions and documents that provided an adequate basis for the arbitration court's decision in this matter.")). Given the wealth of documents and testimony submitted by the intervenors and other parties (*see* Award at 8–12), the Tribunal had sufficient evidence to

---

(1979) ("Collateral estoppel ... has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation.") (citation and footnote omitted). (*See also* Crouter Ex. 115: Letter, dated April 13, 2001, to the Surrogate's Court from the Jungs' counsel, Henry Gradstein ("[O]ur clients would have no desire to proceed with the Will contest if another adjudicative body has already determined that Natasha Gelman had sufficient mental capacity to execute a change of beneficiaries in 1992.").)

render an informed decision. (*See, e.g.,* Melis Aff. ¶ 12 (Article 604 ¶ 1 CCPL "gives the arbitrators large discretion to tailor the proceedings to the circumstances of the case," including "the power to refuse to accept additional evidence if they believe the circumstances of the care are sufficiently clear for the rendering of an award....").)

The Court also finds the Award to be well reasoned and a careful marshaling and analysis of the evidence. (*See* pages 16–20, *supra.*) The Tribunal found that under Liechtenstein law (which appears to be comparable to New York law), "[t]estamentary incapacity is to be assumed only when a substantial deterioration of mental capacities leads to mental disorientation." (Award at 33–35.) *See Rudolf Nureyev Dance Foundation v. Noureeva–Francois,* 7 F.Supp.2d 402, 416 (S.D.N.Y.1998) ("To have the mental capacity to execute a will, the testator need only understand the nature and consequences of executing a will, the nature and extent of the property being disposed of, and the identity of the persons who would be considered the 'natural objects of his bounty and his relations to them.'") (citation omitted). Based upon, among other things, a letter from Samuel Rapoport, M.D. (a New York physician "who examined [Mrs] Gelman for a memory disorder" in January 1992), testimony regarding a December 1992 telephone conversation Mrs. Gelman had with Fritz Hochner (a former director of Credit Suisse), and testimony regarding an October 1993 meeting with Dr. Escher (of Anturia's Board), the Tribunal found that "all the circumstances ... clearly indicate that [Mrs. Gelman's 1992 instructions to the Anturia Board] reflect her true wishes and intentions" (Award at 17–18), she "possessed testamentary capacity" under Liechtenstein law "at the time she signed her instructions," dated June 5, 1992 and September 29, 1992 (Award at 15, 34–35),

and the 1992 By-laws "are legally valid" (Award at 51). The Tribunal discounted the testimony of some of the Arbitration witnesses, such as Levis, who claimed Mrs. Gelman was incompetent, because, among other things, "their observations [referred] to a period of time after 1992 or provide extremely vague information concerning the important time frame." (Award at 19 (citations omitted).) *See, e.g., Estate of Buchanan,* 245 A.D.2d 642, 644, 665 N.Y.S.2d 980, 983 (3d Dep't 1997) ("Mere proof that the decedent suffered from old age, physical infirmity and chronic, progressive senile dementia when the will was executed is not necessarily inconsistent with testamentary capacity and does not alone preclude a finding thereof ..., as the appropriate inquiry is whether the decedent was lucid and rational at the time the will was made."), *leave to appeal dismissed,* 91 N.Y.2d 957, 671 N.Y.S.2d 717, 694 N.E.2d 886 (1998). The Tribunal also observed that "at various earlier times not inconsiderable changes [in Mrs. Gelman's will and the Anturia by-laws] were sometimes made with respect to beneficiaries; various persons and institutions were omitted and others were added," including, for example, the reduction in Mrs. Gelman's bequests to the Jungs' from $2 million to only $20,000 in her 1989 and 1990 wills, *i.e.,* at a time when (even according to the Jungs) Mrs. Gelman was competent. (Award at 26–27.) Similarly, the Tribunal observed that Neschis and Diamond "had already for many years been involved with estate planning and consultation concerning the will provisions of Mr. and Mrs. Gelman and later Natasha Gelman alone, and were always designated to be executrices and/or trustees." (Award at 27.)

An additional "[f]actor[ ] to be considered when determining whether there was a full and fair opportunity to litigate the issue in the prior action in-

clude[s] ... '[the] foreseeability of future litigation.' " *King v. Fox,* 418 F.3d 121, 130 (2d Cir.2005) (quoting *Gilberg v. Barbieri,* 53 N.Y.2d 285, 292, 441 N.Y.S.2d 49, 51, 423 N.E.2d 807 (1981)). Plaintiffs clearly anticipated future litigation. Indeed, prior to the Award, Weizmann had commenced the case at bar and the Jungs had filed objections in the Probate Proceeding, and in both actions there arose the question of the preclusive effect of the Liechtenstein Arbitration. Thus, Plaintiffs were certainly aware that the Arbitration Award might have collateral estoppel effect. (*See* Weizmann Letter to this Court, dated December 14, 2000 ("Weizmann has no objection to any limited stay the Court would suggest" pending resolution of the Liechtenstein Arbitration); Crouter Ex. 117: Stipulation, dated April 24, 2001 (the Jungs agreed to withdraw their objections to probate of the 1993 Will if the Liechtenstein Arbitration "determine[d], for any reason, that the 1992 By–Laws are valid").) Plaintiffs also had notice that "under Liechtenstein law arbitral awards have the same effects as judgments." (Heiss Reply Aff. ¶ 4 (citing CCPL § 611)); Melis Reply Aff. ¶ 14 ("It is therefore, not necessary, and not even provided for under Liechtenstein law to have an arbitral award rendered in an arbitration in Liechtenstein, confirmed by the 'Liechtenstein Court of Justice' "); *see* Award at 29 ("the decision of the arbitration court is a judgment as defined" under Liechtenstein law).

## B. Motion to Dismiss

### 1. Declaratory Judgment

The Dismissal Order held that because "Anturia is a necessary party" to this ac-

tion, "[i]f Plaintiffs wish to pursue declaratory relief claims as presently plead, joinder of Anturia is warranted," and "[i]f joinder is not feasible, then Plaintiffs must show why the declaratory judgment claims should not be dismissed." *Weizmann,* 229 F.Supp.2d at 251. The Jungs responded by repleading a claim for declaratory relief and joining Anturia as a Defendant (Jung Compl. ¶¶ 188–93), but the Court has already dismissed all claims against Anturia because of improper service of process.[29] *See Jung v. Neschis,* 01 Civ. 6993, 2003 WL 1807202, at *3 (S.D.N.Y. Apr.7, 2003) ("Plaintiffs have failed properly to serve the Defendants in Liechtenstein"). The Jungs' opposition to the pending motion to dismiss fails to mention their declaratory relief claim much less "show why the ... claim[ ] should not be dismissed." *Weizmann,* 229 F.Supp.2d at 251.

### 2. Statute of Limitations

Defendants assert that the Jungs' claims for conversion and tortious interference are time-barred under New York's three-year limitations period because the "record unequivocally demonstrates that the allegations of wrongdoing on which the Jungs now rely were known to them at least in June, 1998, more than three years prior to the July 30, 2001 filing of their Complaint." (Def. Mem. at 16–17.)[30] The Jungs counter that, among other things, (1) "New York recognizes the common law doctrine of tolling of claims and estoppel where information essential to a claim is unavailable or unknown to claimants"; and (2) "[n]ot until the discovery during the probate proceedings during 1999 did the Jungs obtain copies of the Anturia by-laws, and only then could they determine how

---

29. Weizmann replead its claim for declaratory relief "solely for purposes of preserving plaintiff's right to appeal." (Weizmann Compl. ¶¶ 176–79 & n. 2.)

30. Defendants do not contend that Weizmann's claims are time-barred.

the by-laws had been manipulated to the enrichment of defendants Littman and Neschis and to the detriment of the Jungs." (Pl. Mem. at 24–25; *see also id.* ("the extent and nature of the wrongful manipulations of Neschis and Littman were not known, and could not have been known," until early 2000, "when the arbitration in Liechtenstein became known").) [31]

"Because both parties have presented material outside the pleadings, the Court treats the motion as one for summary judgment." *Dufort v. Burgos,* No. 04–CV–4940, 2005 WL 2660384, at *1 (E.D.N.Y. Oct. 18, 2005); *see Kennedy v. Empire Blue Cross and Blue Shield,* 989 F.2d 588, 592 (2d Cir.1993) (finding no error in district court's conversion of a Rule 12(b)(6) motion to one for summary judgment where plaintiff submitted materials extraneous to the pleadings); *In re G. & A. Books, Inc.,* 770 F.2d 288, 295 (2d Cir. 1985).

▇▇▇ Plaintiffs' conversion and tortious interference with contractual relations claims "arise under New York law," and "the New York statutes of limitations ... and ... 'state law of equitable tolling should govern....'" *Weizmann,* 229 F.Supp.2d at 252 (citation omitted). Under New York law, a three-year statute of limitations applies to both claims. *Id.* (citing N.Y. C.P.L.R. § 214(3)-(4) (McKinney 1990)). The limitations period on a conversion claim begins to run from the time of conversion, *id.,* which the Jungs allege occurred when Defendants "caus[ed] the execution of the October 19, 1992 By–Laws." (Jung Compl. ¶ 199.) The limitations period on a tortious interference claim begins to run on the date injury is sustained, *Weizmann,* 229 F.Supp.2d at 252, which the Jungs allege (again) occurred when Defendants "fraudulently obtain[ed] the execution of the October 19, 1992 By–Laws" (Jung Compl. ¶ 213). Assuming that Plaintiffs' claims accrued on October 19, 1992, "the limitations period expired on October 19, 1995 ... almost six years before the Jungs instituted their action on July 30, 2001." *Weizmann,* 229 F.Supp.2d at 252.

▇▇▇ Under New York law, "[i]t is the rule that a defendant may be estopped to plead the Statute of Limitations where plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action." *Simcuski v. Saeli,* 44 N.Y.2d 442, 448–49, 406 N.Y.S.2d 259, 262, 377 N.E.2d 713 (1978).

> [T]he burden is on the plaintiff to establish that the action was brought within a reasonable time after the facts giving rise to the estoppel have ceased to be operational. Whether in any particular instance the plaintiff will have discharged his responsibility of due diligence in this regard must necessarily depend on all the relevant circumstances. The length of the legislatively prescribed period of limita-

---

**31.** The Court need not reexamine Defendants' motion to dismiss the conversion and tortious interference claims (*i.e.,* on grounds other than the time-bar), because the Court denied dismissal on the merits in the Dismissal Order. *See Weizmann,* 229 F.Supp.2d at 253 ("Plaintiffs have adequately plead a conversion claim premised upon their future interest in the Foundation's funds pursuant to the August 10, 1989 By–Laws and/or the August 13, 1991 By–Laws."); *id.* at 253–54 (denying motion to dismiss tortious interference claims because "the Court is not in a position, at this time, to resolve the issue of whether or not a [valid, enforceable] contract existed" between the Gelmans and Anturia under Liechtenstein law); *see also Nairobi Holdings Ltd. v. Brown Bros. Harriman & Co.,* No. 02 Civ. 1230, 2004 WL 1124660, at *6 n. 4 (S.D.N.Y. May 20, 2004) (denying motion to dismiss because "the Court has already upheld these claims in [its] prior opinion[ ]").

tions is sometimes said to be relevant, and *courts have held that in no event will the plaintiff be found to have exercised the required diligence if his action is deferred beyond the date which would be marked by the reapplication of the statutory period, i.e., that the length of the statutory period itself sets an outside limit on what will be regarded as due diligence.* *Id.*, 44 N.Y.2d at 450–51, 406 N.Y.S.2d at 263, 377 N.E.2d 713 (emphasis added). In other words, "[i]n no event will a plaintiff be found to have exercised the required diligence where the action is deferred, after the discovery of the relevant facts, beyond the length of the legislatively prescribed period of limitation." *Campbell v. Chabot*, 189 A.D.2d 746, 747, 592 N.Y.S.2d 423, 424 (2d Dep't 1993). Thus, the "outside limit" for the Jungs to have filed their claims was three years from the date upon which they discovered the relevant facts underlying their claims.

In letters to Levis and Credit Suisse, dated June 4, 1998 and June 16, 1998, respectively, the Jungs' Los Angeles counsel, Henry D. Gradstein, described, in detail, allegations that Neschis and Littman conspired to take advantage of Mrs. Gelman's dementia by inducing her to, among other things, direct the adoption of the 1992 By-laws to the detriment of the Jungs.[32] These June 1998 allegations (which are similar to those asserted in the Jung Complaint) were made more than three years before the Jungs commenced this action on July 30, 2001, *i.e.*, beyond the "outside limit on what will be regarded as due diligence," *Simcuski*, 44 N.Y.2d at 450–51, 406 N.Y.S.2d at 263, 377 N.E.2d 713, and the Court, therefore, dismisses as time-barred the Jungs' claims for conversion and tortious interference with contractual relations. *See, e.g., Harris v. Wilmorite Corp.*, 266 A.D.2d 902, 902, 697 N.Y.S.2d 439, 440 (4th Dept.1999) ("The doctrine of equitable estoppel will not apply if the plaintiff possesses 'timely knowledge' sufficient to place him or her under a duty to make inquiry and ascertain all the relevant facts . . . .") (citation omitted).

### 3. RICO

In response to the Court's earlier dismissal of Plaintiffs' RICO claims, the Complaints allege: (1) additional predicate acts by Neschis and Littman of mail and wire fraud, 18 U.S.C. § 1341, 1343, designed to obtain control over Mrs. Gelman's assets, including, among other things, Anturia, Mrs. Gelman's Mexican (and domestic) art collections, funds located in Mexico and New York, and interests in certain film companies ("Wire/Mail Fraud Allegations") (*see* Weizmann Compl. ¶¶ 114–41; Jung Compl. ¶¶ 244–70); and (2) violations of 18 U.S.C. §§ 2314, 2315 by, among other things, "caus[ing] Mrs. Gelman to travel internationally and within the United

---

**32.** (*See* Crouter Ex. 20: Gradstein Letter to Levis, dated June 4, 1998 ("We have reason to believe that beginning in mid to late–1992, Natasha's weakness of mind was exploited by the undue influence of others [including Littman and Neschis], and that, as a result, she was wrongfully induced to alter the by-laws of her Liechtenstein Foundation, and other instruments, to the detriment of the Jungs." "Recently, in a conversation between Janet Neschis and Jerry Jung, Neschis told him that the provisions made abroad [for Jerry and Miroslav Jung] would approximate a mere 4% of the Foundation, far less than the substantial percentages which had previously been documented for the Jungs, and which were Natasha's intentions when she was of sound mind. In other words, Natasha was led to substantially reduce by many millions the percentages for her family, while making what could only be described as a highly questionable, extremely large, percentage provision in favor of Robert Littman."); Crouter Ex. 23: Gradstein Letter to Credit Suisse, dated June 16, 1998.)

States ... in furtherance of the fraudulent scheme," and "transport[ing] in interstate and foreign commerce funds [and art work] in excess of $5,000 that [Defendants] knowingly converted from Mrs. Gelman" or "in furtherance of the scheme to defraud" ("Foreign Transport Allegations") (see Weizmann Compl. ¶¶ 142–47 (claiming violation of both §§ 2314 and 2315); Jung Compl. ¶¶ 271–78 (Neschis and Littman violated 18 U.S.C. § 2314 by "transport[ing] stolen moneys with a value in excess of $5,000.00 in interstate and foreign commerce, knowing the same to have been stolen, converted or taken by fraud.").) [33] Also, Plaintiffs allege that Neschis has engaged in "similar fraudulent conduct against other former clients of her [late] father, Sidney Cohen, Esq.," including that Neschis: (1) falsely claimed ownership of shares in a corporation, Highroad Productions, that Cohen had held "in trust" for film producer Carl Foreman; and (2) "engineered a scheme" to defraud the Estate of Cantinflas (a/k/a Mario Moreno Reyes), a Mexican film star who had been Cohen's client, by depriving the Cantinflas Estate "of its rightful share of the profits of Cantinflas films, and steer[ing] those assets to the Gelman Estate (controlled by Neschis)" and by "fraudulently obtain[ing] Mrs. Gelman's signature" on certain documents (together, the "Foreman/Cantinflas Allegations"). (Weizmann Compl. ¶¶ 85–88, 118, 120, 132–33, 139; Jung Compl. ¶¶ 184–87, 248, 250, 261–62.)

Defendants counter that the Foreman/Cantinflas Allegations "do not plead a RICO pattern" because, among other things: (1) "Plaintiffs do not allege any specific RICO predicate acts committed by Neschis against either of these alleged clients"; (2) although the allegations "sound in fraud," they fail to satisfy Rule 9(b)'s particularity requirements; and (3) the allegations are unrelated to either "'the predicate acts which allegedly injured plaintiff'" or "'to the enterprise ("vertical" relatedness)'." (Def. Mem. at 19–22 (citations omitted).) As to the remaining predicate acts (i.e., the Wire/Mail Fraud Allegations and Foreign Transport Allegations), Defendants argue that Plaintiffs "do not plead a RICO pattern" because "multiplying the number of predicate acts does not translate to [closedended] continuity." (Def. Mem. at 19.) According to Defendants, "Plaintiffs still allege a discrete, limited scheme by two participants (Neschis and Littman) against two victims (Weizmann and the Jungs) in furtherance of a single fraudulent goal (to gain control of Mrs. Gelman's assets)." (Id.)

To state a civil claim for damages under RICO, "a plaintiff has two pleading burdens." Moss v. Morgan Stanley, 719 F.2d 5, 17 (2d Cir.1983). First, a plaintiff must establish: "(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or

---

**33.** Section 2314 provides criminal penalties for any person who, among other things, (1) "transports, transmits, or transfers in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud," or (2) "transports or causes to be transported, or induces any person or persons to travel in, or to be transported in interstate or foreign commerce in the execution or concealment of a scheme or artifice to defraud that person or those persons of money or property having a value of $5,000 or more," 18 U.S.C. § 2314. Section 2314 "prohibits the transport of stolen property, as opposed to the receipt of stolen property, which is prohibited by § 2315." United States v. Schultz, 333 F.3d 393, 402 n. 3 (2d Cir.2003), cert. denied, 540 U.S. 1106, 124 S.Ct. 1051, 157 L.Ed.2d 891 (2004).

participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." *Id.; accord Weizmann*, 229 F.Supp.2d at 254–55. Second, a plaintiff must allege "causation," *i.e.*, that he or she was "injured in his [or her] business or property by reason of a violation of section 1962." *Id.* These "requirements ... must be established as to each individual defendant." *DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir.2001). As noted, Defendants argue solely that the Complaints fail to plead a RICO "pattern."

■■■■■ To establish a RICO "pattern," a plaintiff must allege facts tending to show that "the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). "[A] plaintiff may satisfy the continuity requirement by alleging either a closed-ended pattern—that is, past criminal conduct extending over a substantial period of time—or open-ended continuity—past criminal conduct coupled with a threat of future criminal conduct." *Vicon Fiber Optics Corp. v. Scrivo*, 201 F.Supp.2d 216, 220 (S.D.N.Y.2002); *accord Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.*, 187 F.3d 229, 242 (2d Cir.1999).

### a. Open–Ended Continuity

■■■■ Plaintiffs have not adequately plead open-ended continuity, as there is no colorable "threat of continuing criminal activity beyond the period during which the predicate acts were performed." *Cofacredit*, 187 F.3d at 242. It "defies logic to suggest that a threat of continued looting activity exists when," as here, "there is nothing left to loot." *GICC Capital Corp. v. Tech. Fin. Group, Inc.*, 67 F.3d 463, 466 (2d Cir.1995); *see First Capital Asset Management, Inc. v. Satinwood, Inc.*, 385

F.3d 159, 180–81 (2d Cir.2004) ("Once [defendant] had fraudulently conveyed his assets, .... the scheme essentially came to its conclusion." "[C]ontinued silent concealment of assets is not a predicate act."); *D.R.S. Trading Company, Inc. v. Fisher*, No. 01 Civ. 8028, 2002 WL 1482764, at *5 (S.D.N.Y. July 10, 2002) ("[T]here is no open-ended continuity because there is no likelihood that the fraud against [plaintiff] will continue since [plaintiff] has terminated its relationship with defendants."); *Thai Airways Intl. v. United Aviation Leasing B.V.*, 842 F.Supp. 1567, 1572–73 (S.D.N.Y.1994) ("Any continuing concealment or transfer of the security deposits would not cause any additional harm ... and would not enlarge the scope of the isolated alleged fraud.").

Plaintiffs have sought to bolster their open-ended continuity claim—*i.e.*, to establish that Defendants' criminal activity threatens to continue in the future—by adding the Foreman/Cantinflas Allegations that Neschis has engaged in "similar fraudulent conduct against other former clients" of her late father, Cohen. (Pl. Mem. at 20.) Those allegations fail for two reasons.

■■■■ First, the Foreman/Cantinflas Allegations, which sound in fraud, "fail to comply with Fed.R.Civ.P. 9(b)" requiring that fraud be pleaded with particularity. *See McLaughlin v. Anderson*, 962 F.2d 187, 191 (2d Cir.1992) ("Allegations of mail fraud [as RICO predicate acts] must be made with the particularity required by [Rule 9(b) ].". "[T]he 'complaint must adequately specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiffs contend the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements.' Plaintiffs asserting mail fraud must also identify the purpose of the

mailing within the defendant's fraudulent scheme." *Id.* (citations omitted). The Foreman/Cantinflas Allegations fail to include specific statements claimed to be misleading, why they were misleading, or when and where the statements were made. (*See* Weizmann Compl. ¶¶ 85–88, 118, 120, 132–33, 139; Jung Compl. ¶¶ 184–87, 248, 250, 261–62.) [34]

■ Second, the Foreman/Cantinflas Allegations are unrelated to the remaining predicate acts. *H.J., Inc.,* 492 U.S. at 239, 109 S.Ct. 2893 (In order "to prove a pattern of racketeering activity a plaintiff . . . must show that the racketeering predicates are related."). Predicate acts are "related" when they "have the same or similar purposes, results, participants, victims, methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 240, 109 S.Ct. 2893. The Foreman/Cantinflas Allegations and the remaining predicate acts are related "only in the sense that they allegedly involve [some of] the same parties." *McLaughlin,* 962 F.2d at 191; *accord Bernstein v. Misk,* 948 F.Supp. 228, 237 (E.D.N.Y.1997) ("Because the bank frauds bear almost no relation to the predicate acts which allegedly injured the plaintiffs, they cannot be properly considered as part of the 'pattern' of racketeering activity.").

### b. Closed–Ended Continuity

■ Defendants argue that Plaintiffs have not adequately alleged closed-ended continuity because "all [Plaintiffs] have done is splinter their allegations into additional predicate acts. Plaintiffs continue to allege solely a discrete, limited scheme by two participants (Neschis and Littman) against two victims (Weizmann and the Jungs) to further a single fraudulent goal (to gain control of Mrs. Gelman's assets)." (Def. Reply at 9.) " 'That Defendants used several different tactics to achieve this goal does not turn Defendants' scheme into one with multiple goals and/or victims, and does not mandate a finding of continuity sufficient to support a RICO claim." ' (*Id.* (citation omitted).)

Plaintiffs counter that they "allege a comprehensive scheme by which defendants took advantage of Mrs. Gelman's lack of mental capacity to obtain the fraudulent execution of documents, including letters of instructions, wills, powers of attorney and a trust instrument, without authority from Mrs. Gelman, that were designed to change Mrs. Gelman's financial affairs and estate plan, and divert her assets to defendants' own benefit. . . . The Amended Complaints allege that 'Defendants altered her New York will, her Mexican will, the dispositive provisions of the Anturia Foundation, her plans for her Mexican art collection, her interest in entities formed by her late husband to receive substantial royalties from his films, and created a new inter vivos trust to circumvent the testamentary trust that had been

**34.** For example, the fraud allegations regarding Carl Foreman assert, in the most general terms, that Neschis's father, Cohen, held 75% of Highland Productions "in trust" for Foreman, that after Cohen's death, Neschis "claimed ownership of the shares and refused to relinquish them," and that Neschis was sued for return of the shares. (Weizmann Compl. ¶ 86; Jung Compl. ¶ 185.) The Complaints also note that as part of the settlement of that lawsuit "Neschis extracted a peculiar concession from [plaintiff] that 'Janet C. Neschis should not have been named a defendant herein' "—a concession that cannot be said to support a fraud allegation in this case. *See, e.g., Anatian v. Coutts Bank (Switzerland) Ltd.,* 193 F.3d 85, 88 (2d Cir.1999) (affirming dismissal of RICO claim for failure to plead fraud with particularity); *accord Shamis v. Ambassador Factors Corp.,* No. 95 Civ. 9818, 1997 WL 473577, at *15 (S.D.N.Y. Aug.18, 1997).

included in Mrs. Gelman's wills since at least 1968." ' (Pl. Mem. at 19.)

 Closed-ended continuity is "demonstrated by predicate acts that amount to continued criminal activity by a particular defendant." *Cofacredit,* 187 F.3d at 242 (citation omitted). Because closed-ended continuity is "centrally a temporal concept," it may be demonstrated by "proving a series of related predicates extending over a substantial period of time." *H.J., Inc.,* 492 U.S. at 242, 109 S.Ct. 2893. Several factors may be considered, including, among other things, "the length of time over which the alleged predicate acts took place, the number and variety of acts, the number of participants, the number of victims, and the presence of separate schemes." *GICC,* 67 F.3d at 467 (citations omitted).

Defendants do not appear to dispute that the Complaints adequately plead fraud with respect to the alleged underlying scheme "to obtain control over Mrs. Gelman's substantial assets," including fraudulent execution of, among other things, her New York and Mexican wills, powers of attorney, the Inter Vivos Trust, and the Anturia by-laws. (Weizmann Compl. ¶ 1.) Defendants also do not appear to dispute the sufficiency of the predicate acts pleaded in the Wire/Mail Fraud Allegations and the Foreign Transport Allegations. The Court, therefore, finds that Plaintiffs have adequately alleged closed-ended continuity, *i.e.,* over a period of at least seven years, Neschis and Littman committed at least 24 predicate acts (and more than two acts each). (*See* Weizmann Compl. ¶¶ 114–47 (alleging 28 acts); Jung Compl. ¶¶ 244–78 (alleging 24 acts); *see also* Pl. Mem. at 18 ("Defendants no longer contend that the alleged predicate acts or time period are insufficient").) The Complaints allege a continuing effort by Neschis and Littman from 1992 to at least 1999 to obtain control over, among other things, Anturia, the Inter Vivos Trust, Mrs. Gelman's Mexican and domestic artworks, and Mexican and domestic bank accounts, through a variety of means, including fraudulent execution of her Mexican will, powers of attorney, letters of instructions regarding Anturia's by-laws, and the Inter Vivos Trust, to the detriment of Weizmann, the four Jung Plaintiffs, and four others whose shares of Anturia were eliminated or reduced by the 1992 By-laws: The Metropolitan Museum, Otto Naegeli–Stiftung, Swiss National Fund, and Mrs. Suzy Abramov de Gilly (Crouter Ex. 3). *See Environmental Tectonics v. W.S. Kirkpatrick, Inc.,* 847 F.2d 1052, 1066 (3d Cir.1988), *aff'd on other grounds,* 493 U.S. 400, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990); *Cohen v. Wolgin,* Civ. No. 87–2007, 1995 WL 33095, at *11 (E.D.Pa. Jan.24, 1995) ("In seeking to define the pattern of racketeering, a plaintiff may include whatever acts are parts of the same pattern, even though the plaintiff may only have been injured by one of those acts."). In *Jacobson v. Cooper,* 882 F.2d 717 (2d Cir.1989), the Second Circuit affirmed a finding of closed-ended continuity where, over the course of six years, two defendants engaged in a series of real estate transactions for the purpose of "control[ing] and wrongfully appropriat[ing] [plaintiff's] 'real estate enterprise and properties.' " *Id.* at 718–20; *see United States v. Indelicato,* 865 F.2d 1370, 1383 (2d Cir.1989) (multiple acts of racketeering are not to be excluded from the reach of RICO "simply because ... they further but a single scheme"); *see also Congregacion de la Mision Provincia de Venezuela v. Curi,* 978 F.Supp. 435, 447–48 (E.D.N.Y. 1997); *Gunther v. Dinger,* 547 F.Supp. 25, 26–27 (S.D.N.Y.1982). And, Defendants do not appear to dispute that the predicate acts alleged are "part of the execution" of Defendants' alleged underlying fraudulent

scheme. *See Center Cadillac, Inc. v. Bank Leumi Trust Co. of New York,* 808 F.Supp. 213, 228 (S.D.N.Y.1992) ("[M]ailings themselves need not contain misrepresentations, nor must they contribute directly to the deception of the plaintiffs," as long as they are "part of the execution of the [underlying fraudulent] scheme."), *aff'd,* 99 F.3d 401, 1995 WL 736336 (2d Cir.1995).

### 4. Constructive Trust

The Jungs have replead their constructive trust claims and added a related claim for unjust enrichment, and Weizmann has added a constructive trust claim (while including unjust enrichment as an element of the claim). (Jung Compl. ¶¶ 292–313; Weizmann Compl. ¶¶ 161–68.)

Defendants assert that these claims should be dismissed because, among other things: (1) "Plaintiffs do not allege that Defendants made an express or implied promise *to the Plaintiffs,* as New York law requires"; (2) "Plaintiffs have not alleged that they made a 'transfer of any property in reliance' on an alleged promise" by Defendants; (3) "Plaintiffs have not alleged facts demonstrating that a legal remedy, such as money damages, is inadequate here"; (4) Liechtenstein law "would not recognize [Plaintiffs'] constructive trust claims" or the Jungs' unjust enrichment claim; and (5) the unjust enrichment claim fails to allege that the Jungs "performed services for Defendants or that Defendants benefitted from such services." (Def. Mem. at 17–18, 22–25). Plaintiffs counter that, among other things: (1) "[a]lthough the factors generally considered for imposing a constructive trust 'are useful in many cases [the] constructive trust doctrine is not rigidly limited' " (Pl. Mem. at 22 (citation omitted)); (2) "Defendants' contentions that plaintiffs have not alleged a promise made *to them,* or that *they* transferred property in reliance on the promise,

or that there exists a fiduciary relationship between defendants and plaintiffs … do not prevent the imposition of a constructive trust in this case" under New York law (*id.* at 23); and (3) "plaintiffs are entitled to plead in the alternative and cannot be barred from seeking equitable relief because they are also seeking legal relief" (*id.* at 23–24).

 A constructive trust is an equitable remedy designed to "prevent unjust enrichment, although unjust enrichment does not necessarily implicate the performance of a wrongful act." *Counihan v. Allstate Ins. Co.,* 194 F.3d 357, 361 (2d Cir.1999). "New York law generally requires that a party establish four elements before a constructive trust may be imposed: (1) a confidential or fiduciary relationship; (2) an express or implied promise; (3) a transfer made in reliance on that promise; and (4) unjust enrichment." *ESI, Inc. v. Coastal Power Production Co.,* 995 F.Supp. 419, 436 (S.D.N.Y.1998); *accord Weizmann,* 229 F.Supp.2d at 257–58. "While these elements serve as important guideposts, the constructive trust doctrine is equitable in nature and should not be rigidly limited." *Weizmann,* 229 F.Supp.2d at 258 (citation omitted). At the pleading stage, Plaintiffs may request both money damages and a constructive trust in the alternative. *See ESI, Inc.,* 995 F.Supp. at 436 (Fed.R.Civ.P. 8(e)(2) permits alternative pleading of claims for a constructive trust and for contract damages); *accord Securities Investor Protection Corp. v. Stratton Oakmont, Inc.,* 234 B.R. 293, 332–33 (Bankr.S.D.N.Y.1999).

 Plaintiffs have adequately pleaded claims for a constructive trust to prevent unjust enrichment. In a similar case, *Latham v. Father Divine,* 299 N.Y. 22, 85 N.E.2d 168 (1949), the New York Court of Appeals held that a constructive trust was appropriate where defendants had alleged-

ly used fraud, undue influence, force, and, ultimately, murder to prevent a testatrix from revoking a will favorable to them:

> A constructive trust will be erected whenever necessary to satisfy the demands of justice. Since a constructive trust is merely 'the formula through which the conscience of equity finds expression' ... its applicability is limited only by the inventiveness of men who find new ways to enrich themselves unjustly by grasping what should not belong to them. Nothing short of true and complete justice satisfies equity, and, always assuming these allegations to be true, there seems no way of achieving total justice except by the procedure used here.

*Id.*, 299 N.Y. at 27, 85 N.E.2d at 170 (citations omitted). The Court of Appeals found the requirements of a constructive trust satisfied even though the "complaint [did] not say that decedent, or defendants, promised plaintiffs anything, or that defendants made any promise to decedent." *Id.*, 299 N.Y. at 29, 85 N.E.2d at 171; *accord Dawson v. Vasquez*, 139 Misc.2d 588, 590–91, 528 N.Y.S.2d 255, 256–57 (1988) ("[E]quity demands that a constructive trust be created and that the legatee or devisee who prevented the testator from making a new will in favor of another, holds the property in trust for the intended legatee or devisee." "The instant case is similar in many respects to the circumstances in *Latham v. Father Devine* ..., where, in the absence of a fiduciary relationship, a promise and a transfer in reliance upon the promise, a constructive trust was imposed ...."), *aff'd*, 153 A.D.2d 836, 545 N.Y.S.2d 682 (2d Dep't 1989); *see also Howland v. Smith*, 9 A.D.2d 197, 193 N.Y.S.2d 140 (3d Dep't 1959) (constructive trust found appropriate where defendant, who was decedent's attorney, unduly influenced decedent to make *inter vivos* gifts at expense of plaintiff, a beneficiary under decedent's will), *aff'd*, 10 N.Y.2d 754, 219 N.Y.S.2d 607, 177 N.E.2d 49 (1961);. Diane J. Klein, *A Disappointed Yankee in Connecticut (Or Nearby) Probate Court: Tortious Interference With Expectation of Inheritance—A Survey With Analysis Of State Approaches In The First, Second, And Third Circuits*, 66 U. Pitt. L.Rev. 235, 282 (Winter 2004) ("New York does not recognize a tort remedy for wrongful interference with an inheritance. Instead, New York has a very well-developed jurisprudence relating to an equitable remedy (the imposition of a constructive trust) in this situation."); James Lockhart, Cause of Action for Interference With Expected Gift or Inheritance, 2 *Causes of Action 2d*, § 13 (2005); *see also* Klein, *Disappointed Yankee*, 66 U. Pitt. L.Rev. at 249–50 (key consideration is whether federal judgment would "improperly interfere with the probate process," over which the New York Surrogate's Court has "exclusive" jurisdiction); *Latham*, 299 N.Y. at 28–29, 85 N.E.2d at 171 (Approving constructive trust because, among other things, nothing in the New York "Decedent Estate Law ... or the Statute of Frauds stands in the way of recovery," as plaintiff was not attempting "to probate or establish the will which plaintiffs say testatrix was prevented from signing...").

## V. Conclusion and Order

For the reasons set forth below, the Court grants in part and denies in part Defendants' motion [66] for summary judgment and grants in part and denies in part Defendants' motion in the alternative to dismiss.

Counsel are requested to appear at a status/scheduling/settlement conference with the Court on December 20, 2005, at 11:00 a.m., in Courtroom 706 of the Thurgood Marshall Courthouse, 40 Centre

692

Street, New York, New York. **The Court directs the parties to engage in good faith settlement negotiations prior to the conference with the Court.**